UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DOCKET NO.:

| | | |
|---|---|---|
| LEE B. KAUFFMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| UNUM LIFE INSURANCE | ) | EXHIBIT A |
| COMPANY OF AMERICA, | ) | |
| UNUM GROUP, | ) | |
| DRAKE BEAM MORIN, INC. LONG TERM | ) | |
| DISABILITY PLAN | ) | |
| | ) | |
| Defendants. | ) | |

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x
                                  :

DEBORAH DANIEL,                         :

               Plaintiff,        :     **CV-04-1073 (SJF)**

                                    :

        – against –       :     **DECLARATION OF**
                                    :     **WILLIAM T. BRADLEY, II**

UNUMPROVIDENT CORPORATION, UNUM LIFE  :
INSURANCE COMPANY OF AMERICA, LIB/GO  :
TRAVEL INCORPORATED GROUP LONG TERM  :
DISABILITY PLAN, and LIB/GO TRAVEL  :
INCORPORATED GROUP LIFE INSURANCE PLAN,  :

                                  :

             Defendants.      :

                                  :

------------------------------------------------------------------------x

     William T. Bradley, II declares the following to be true under penalties of perjury:

     1.     I am a senior consultant employed by Unum Group, which is the owner of Unum Life Insurance Company of America ("Unum Life"). I submit this declaration based on my personal knowledge, and my knowledge of the books and records of Unum Group and Unum Life.

     2.     On June 30, 1999, UNUM Corporation merged with Provident Companies, Inc., and effective June 30, 1999, Provident Companies, Inc. amended its charter to change its name to UnumProvident Corporation (in 2007, UnumProvident Corporation changed its name to Unum Group, and I will refer to it as "Unum Group"). As a result of this merger, Unum Life became a wholly owned subsidiary of Unum Group.

     3.     Unum Group is a Delaware general business corporation and a non-insurance holding company of all Unum Group subsidiary companies. It is, and has always been, a holding company that is not licensed or authorized to sell insurance in any state. Unum Group has no contractual relationship with plaintiff or plaintiff's employer regarding disability benefits.

4.     Unum Life is a Maine corporation that is in good standing and is authorized to do business as an insurance company by the Commissioner of Insurance of the State of Maine. At all relevant times, Unum Life has maintained a separate corporate existence, including having corporate books and records separate from Unum Group and different Boards of Directors than Unum Group.

5.     Unum Group did not, and never has, assumed liability for any insurance claims maintained against Unum Life.

6.     Effective January 1, 2001, Unum Group and Unum Life entered into a General Services Agreement ("GSA") whereby Unum Group assumed the employ of certain personnel and provided its employees to Unum Life to perform various services within Unum Life (a copy is annexed as Exhibit A). The reasons for the GSA are set forth in the opening "Whereas" clauses of the agreement:

> WHEREAS, Recipient [Unum Life] operates principally in the life and health insurance business; and
>
> WHEREAS, Provident Companies, Inc. acquired by merger UNUM Corporation and its various subsidiaries and changed its name to UnumProvident: and
>
> WHEREAS, as a result of such merger, duplicate functions within the separate insurance companies existed, which resulted in certain inefficiencies; and
>
> WHEREAS, employees increasingly were required to work across subsidiary lines to accomplish strategic objectives; and
>
> WHEREAS, employees and specialized skills need to be available to work in various operating subsidiaries of UnumProvident to most effectively use their talents; and
>
> WHEREAS, in order to improve operations, to utilize personnel and resources more effectively, to better monitor performance in various job functions, and to effectively propose changes to such functions, UnumProvident has assumed the employ of certain personnel ; and

2

WHEREAS, Recipient desires that UnumProvident provide the services specified in Appendix A, and such other services as to which the parties may agree from time to time (collectively "Services"); and

WHEREAS, UnumProvident desires to provide such Services to Recipient[.]

7.     Appendix A to the GSA states, among other things, that UnumProvident is to "provide comprehensive claims management services" to Unum Life.

8.     The GSA confirms that Unum Life maintained absolute control over its own business and operations, including the determination of claims, as expressly set forth in Section 1.5:

The performance of the Services by UnumProvident for Recipient under this Agreement shall in no way impair the absolute control of the business and operations of UnumProvident or Recipient by their respective Boards of Directors. UnumProvident shall act hereunder so as to assure the separate operating identity of Recipient. The Services shall at all times be subject to the direction and control of the Board of Directors of Recipient.

9.     In contrast to the absolute control that Unum Life maintained over its business and operations, Unum Group's control was limited to human resources matters such as hiring, firing, paying, promoting and transferring workers. Specifically, section 8 of the GSA which provides that Unum Group controls the "employment direction, compensation and discharge of all Associates ... [and] will be solely responsible for all matters relating to payment of such Associates, including compliance with workers' compensation, unemployment insurance, social security, withholding and all other federal, state and local laws, rules and regulations governing such matters."

10.     At no time, under the GSA or any other agreement, did Unum Life delegate the power, or responsibility, to determine claims under insurance policies that Unum Life issued. Likewise, while it contracted for Unum Group's personnel to manage claims under policies Unum Life issued,

Unum Life did not delegate to Unum Group the power or responsibility to determine plaintiff's claim for disability benefits. That determination was made by Unum Life.

Dated: October 13, 2009

_____
William T. Bradley, II

**EXHIBIT A**

# GENERAL SERVICES AGREEMENT

This General Services Agreement (the "Agreement") is made and entered into effective as of the 1st day of January, 2001 by and between UNUMPROVIDENT CORPORATION, a Delaware corporation ("UNUMProvident"), and UNUM LIFE INSURANCE COMPANY OF AMERICA, a Maine corporation ("Recipient").

**WHEREAS**, Recipient operates principally in the life and health insurance business; and

**WHEREAS**, Provident Companies, Inc. acquired by merger UNUM Corporation and its various subsidiaries and changed its name to UNUMProvident; and

**WHEREAS**, as a result of such merger, duplicate functions within the separate insurance companies existed, which resulted in certain inefficiencies; and

**WHEREAS**, employees increasingly were required to work across subsidiary lines to accomplish strategic objectives; and

**WHEREAS**, employees with specialized skills need to be available to work in various operating subsidiaries of UNUMProvident to most effectively use their talents; and

**WHEREAS**, in order to improve operations, to utilize personnel and resources more effectively, to better monitor performance in various job functions, and to effectively propose changes to such functions, UNUMProvident has assumed the employ of certain personnel; and

**WHEREAS**, Recipient desires that UNUMProvident provide the services specified in Appendix A, and such other services as to which the parties may agree from time to time (collectively "Services"); and

**WHEREAS**, UNUMProvident desires to provide such Services to Recipient;

**THEREFORE**, in consideration of the mutual covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is mutually covenanted and agreed by and between the Parties hereto as follows:

## 1. GENERAL DUTIES

1.1    UNUMProvident agrees to provide the Services listed in Appendix A, as required by Recipient in accordance with specifications and requirements of Recipient as communicated from time to time, and such other Services to which the parties may agree and identify in an amendment to Appendix A.

1.2    UNUMProvident shall be responsible for providing only those physical assets required in connection with its provision of services hereunder identified on Appendix C, or as otherwise agreed by the parties from time to time, at its own cost and expense and without a separate fee related thereto. UNUMProvident shall be responsible for the costs of maintaining

and servicing equipment owned by UNUMProvident and located on Recipient's premises or used in providing services to Recipient, as set forth in Appendix A and shall not be entitled to a separate fee or charge related thereto.

1.3     UNUMProvident shall comply with all applicable federal, state, and local laws applicable to it or Recipient in connection with providing services hereunder. In addition, UNUMProvident employees ("Associates") must satisfy those standards established by Recipient, and communicated to UNUMProvident orally or in writing. UNUMProvident warrants that all Services shall be provided promptly and diligently and all work shall be performed in a workmanlike manner in accordance with the industry's customary professional standards and to Recipient's reasonable satisfaction. In addition, Associates with records of felony criminal convictions shall not be knowingly assigned to provide Services to Recipient until a detailed statement of the circumstances is furnished to Recipient for its review and Recipient has given its written approval of such assignment. Further, UNUMProvident will comply with the records retention requirements of state insurance regulatory authorities including, but not limited to the requirements under New York Insurance Department Regulation 152.

1.4     UNUMProvident shall maintain the exclusive right to exercise direction and control over Associates performing Services for Recipient. All decisions as to the identity and number of Associates to be assigned to provide Services on UNUMProvident's behalf to Recipient shall be made in the sole discretion of UNUMProvident. UNUMProvident may reassign Associates to its other clients.

1.5     The performance of the Services by UNUMProvident for Recipient under this Agreement shall in no way impair the absolute control of the business and operations of UNUMProvident or Recipient by their respective Boards of Directors. UNUMProvident shall act hereunder so as to assure the separate operating identity of Recipient. The Services shall at all times be subject to the direction and control of the Board of Directors of Recipient.

1.6     The parties have agreed to the services and conditions related thereto set forth on Appendix A and to the Service Fee, as defined below, there set forth. Recipient shall provide a written statement ("Notice") to UNUMProvident at least one month prior to any proposed change in the Services and/or equipment desired. Such Notice shall contain the following information:

        a.      A description of any change in the Services to be performed, required performance standards and conditions, and equipment or other physical assets to be provided by UNUMProvident;

        b.      Any other information relating to Services provided under this Agreement.

In addition, if there is any change or addition in the locations where Services are to be performed, these will be communicated by Recipient to UNUMProvident.

As soon as practicable following receipt of the Notice, UNUMProvident shall furnish to Recipient a statement of the estimated costs associated with providing Services under this Agreement. In the event Recipient objects to the determination of estimated costs, it shall

provide UNUMProvident with notice of such objection and the reasons therefor. In the event that either UNUMProvident elects not to respond to such subsequent notice or UNUMProvident and Recipient are unable to reach an agreement as to the appropriate amount for estimated costs, Recipient may elect (i) not to engage UNUMProvident for the provision of such services and such election shall be effective on the date as to which such redetermined estimated costs otherwise would become applicable; or (ii) to cause the provisions of Section 10 to apply.

    1.7    Actual Costs shall include the allocable portion of UNUMProvident's expenses for the following items for the twelve (12) month (or other) period:

    1.    The appropriately allocable portion of salaries, bonuses, contributions to retirement and welfare plans, workers' compensation and other insurance premiums, and taxes (such as unemployment, social security and Medicare taxes), other contributions where required by law paid by UNUMProvident on behalf of its Associates, and training, licensing, travel, publications, education, association dues and other costs of its Associates;

    2.    The allocable portion of amounts paid by UNUMProvident to maintain or repair the equipment listed in Appendix C (and other equipment that is reasonably necessary) used to provide Services to Recipient.

    3.    Amounts paid to purchase supplies in connection with the provision of Services to Recipient; and

    4.    Depreciation, amortization, and related overhead and similar costs allocable to the services provided.

    In addition, Actual Costs shall include properly apportioned costs that relate in part to UNUMProvident and its business.

    1.8    Estimated Costs shall be reviewed periodically and adjusted to bring them into alignment with Actual Costs. The allocable portion of UNUMProvident's expenses shall be determined on a fair and equitable basis, as set forth on Appendix B.

## 2.    FEES AND EXPENSES

    2.1    Recipient agrees to pay to UNUMProvident a Service Fee computed and payable as follows:

    a.    Recipient shall pay to UNUMProvident a quarterly Service Fee equal to the product of the Applicable Percentage and UNUMProvident's Actual Costs of providing services to Recipient for the preceding quarter.

    b.    Such Service Fee shall be billed on a quarterly basis by UNUMProvident and payments shall be due within thirty (30) days. After thirty (30) days, interest shall accrue on the outstanding balance owed at the short term applicable federal rate. Each invoice shall specify with particularity the services provided and the related charge.

c.      The Applicable Percentage shall be 5% as to each category of service.

d.      Actual Costs shall be the costs actually incurred by UNUMProvident in providing the services outlined herein, including appropriate charges for overhead. Actual Costs shall be allocated to the services provided hereunder in the manner set forth on Appendix B.

2.2      In addition to the Services Fee, UNUMProvident shall be entitled to reimbursement for the cost of any third-party service providers paid by it providing services solely related to Recipient, such as attorneys, accountants and consultants not billed directly to Recipient. Such sums shall not be subject to any mark-up and shall not be included in Estimated or Actual Costs. Any such amounts shall be separately identified on Recipient's quarterly invoice and supporting documentation for such charges shall be included. Any such charges allocable both to Recipient and UNUMProvident shall be allocated on a reasonable basis between the parties based on relevant factors.

2.3      In connection with providing Services to Recipient, UNUMProvident shall be responsible for payment of all costs related thereto except as specifically set forth. Without limiting the generality thereof, UNUMProvident shall be responsible for payment of all insurance, all unemployment, social security, withholding and other payroll taxes, including contributions when required by law and all recruiting and other personnel costs.

2.4      If Recipient disputes any invoice rendered or amount determined to be paid hereunder, Recipient shall so notify UNUMProvident in writing, and the parties shall use their best efforts to resolve such dispute expeditiously. If Recipient notifies UNUMProvident of a disputed invoice, and there is a good faith basis for such dispute, the time for paying the portion of the invoice in dispute shall be extended until resolution of such dispute. In the event, after good faith efforts to resolve such dispute, the parties are unable to reach an agreement, either party may submit such dispute to mediation under Section 10 hereof.

2.5      UNUMProvident shall keep all accounts and records, insofar as they pertain to the computation of charges, available at its principal offices for audit and inspection by Recipient and persons authorized by Recipient or any governmental agency having jurisdiction over UNUMProvident during all reasonable business hours.

2.6      All amounts payable by Recipient to UNUMProvident for Services rendered shall be remitted in United States dollars, provided, however, that UNUMProvident at its option may require payment in a foreign currency where it incurs costs in such currency.

2.7      All charges for Services shall be reasonable and in accordance with applicable state law requirements, including New York Insurance Department Regulation 33.

3.      **TERM OF THE AGREEMENT**

3.1      The initial term of this Agreement shall be for a period of one (1) year, commencing on the 1st day of January, 2001, subject to earlier termination as hereinafter

provided. The term of this Agreement shall be automatically renewed for successive periods of one year unless either party notifies the other in writing at least sixty days before the annual expiration date that such party declines to so renew.

3.2     This Agreement may be terminated in whole or in part by either party upon (a) ninety (90) days prior written notice to the other party without cause if the terminating party, in its sole discretion, determines that this contract no longer serves its best interests, or (b) thirty (30) days with cause. For purposes of this Agreement, "cause" shall mean (i) the material breach by the other party of any material term, condition or representation contained within this Agreement and the failure of the breaching party to cure the same within thirty (30) days of receiving notice thereof from the other party or (ii) fraudulent or criminal behavior by either party in performing its obligations hereunder.

3.3     If either party to this Agreement becomes or is declared insolvent or bankrupt, initiates, consents to or becomes the subject of any proceedings relating to its liquidation, insolvency or for the appointment of a receiver or similar officer for it, makes an assignment for the benefit of all or substantially all of its creditors, or enters into an agreement for the composition, extension, or readjustment of all or substantially of all of its obligations, all of which shall be deemed events of default, then the other party to this Agreement may terminate this Agreement by giving written notice of such termination to such party as of a date specified in such notice.

3.4     In the event of termination of this Agreement, all of Recipient's property and all work relating thereto in UNUMProvident's possession shall be forwarded promptly to Recipient.

3.5     Any delays in or failure of performance by UNUMProvident shall not constitute a default hereunder if and to the extent such delay or failure of performance is caused by occurrences beyond the reasonable control of UNUMProvident, including, but not limited to: acts of God or the public enemy; expropriation or confiscation of facilities; compliance with any order or request of any governmental authority; acts of war; riots or strikes or other concerted acts of Associates or others; or any causes, whether or not of the same class or kind as those specifically named above, which are not within the reasonable control of UNUMProvident, and which by the exercise of reasonable diligence, UNUMProvident is unable to prevent.

## 4.     ASSIGNMENT

This Agreement shall be binding upon and inure to the benefit of UNUMProvident and Recipient and their respective successors and assigns, except that neither party may assign its rights under this Agreement without the prior written consent of the other party.

## 5.     INDEMNIFICATION

5.1     UNUMProvident shall indemnify and hold harmless Recipient from and against any fine, penalty, loss, damage, injury, claim, cost, expense (including reasonable attorneys' fees and other reasonable costs and expenses incident to any suit, action, investigation, claim or proceeding) or other liability (individually and collectively, "Liabilities") to the extent it is finally determined by a court of competent jurisdiction or arbitrator that such Liabilities arise out of any

act or omission of UNUMProvident in connection with the performance of Services under this Agreement, if such acts or omissions are determined by such court to constitute:

      a.    the failure of UNUMProvident to perform its obligations under this Agreement;

      b.    ordinary negligence of UNUMProvident or UNUMProvident's Associates, if such negligence has material adverse consequences to Recipient; or

      c.    gross negligence or willful misconduct of UNUMProvident or UNUMProvident's Associates (including any dishonest, fraudulent, or criminal acts or omissions, acting alone or in collusion with others).

5.2    Notwithstanding Section 5.1, UNUMProvident shall not be obligated to so indemnify or hold Recipient harmless to the extent that it is finally determined by a court of competent jurisdiction or arbitrator that such Liabilities arise out of any act or omission of Recipient in connection with the performance of Recipient's obligations hereunder, which acts or omissions are determined to constitute:

      a.    the failure of Recipient to perform its obligations under this Agreement;

      b.    ordinary negligence of Recipient, if such negligence has material adverse consequences to UNUMProvident;

      c.    gross negligence or willful misconduct of Recipient (including any dishonest, fraudulent, or criminal acts or omissions of Recipient, acting alone or in collusion with others); or

      d.    any act or omission of UNUMProvident taken or omitted at the express direction of Recipient.

5.3    Recipient shall indemnify and hold harmless UNUMProvident from and against any Liabilities to the extent it is finally determined by a court of competent jurisdiction or arbitrator that such Liabilities arise out of any act or omission of Recipient in connection with the performance of Recipient's obligations hereunder, which acts or omissions are determined to constitute:

      a.    the failure of Recipient to perform its obligations under this Agreement;

      b.    ordinary negligence of Recipient, if such negligence has material adverse consequences to UNUMProvident;

      c.    gross negligence or willful misconduct of Recipient (including any dishonest, fraudulent, or criminal acts or omissions of Recipient, acting alone or in collusion with others); or

      d.    any act or omission of UNUMProvident taken or omitted at the express direction of Recipient.

5.4    Notwithstanding Section 5.3, Recipient shall not be obligated to so indemnify or hold UNUMProvident harmless to the extent it is finally determined by a court of competent jurisdiction or arbitrator that such Liabilities arise out of any act or omission of UNUMProvident or UNUMProvident's Associates in connection with the performance of UNUMProvident's obligations hereunder, which acts or omissions are determined to constitute:

      a.    the failure of UNUMProvident to perform its obligations under this Agreement;

      b.    ordinary negligence of UNUMProvident, if such negligence has material adverse consequences to Recipient; or

      c.    gross negligence or willful misconduct of UNUMProvident or UNUMProvident's Associates (including any dishonest, fraudulent, or criminal acts or omissions, acting alone or in collusion with others).

## 6.    INSURANCE

6.1    In connection with providing Services to Recipient, UNUMProvident shall be responsible for carrying insurance required under the laws, ordinances, and regulations of any governmental authority.

6.2    In addition to required insurance, UNUMProvident shall carry the following additional insurance:

      a.    Commercial General Liability (Bodily Injury and Property Damage) Insurance in an amount not less than $1,000,000 per occurrence/$2,000,000 general aggregate, including the following supplemental coverages:

      1.    Contractual Liability to cover liability assumed under this Agreement;

      2.    Personal Injury Liability;

      3.    Product and Completed Operations Liability; and

      4.    Broad Form Property Damage Liability;

      b.    Business Automobile Liability Insurance in an amount not less than $1,000,000 combined single limit liability per accident if any automobiles leased or owned by UNUMProvident (or UNUMProvident's Associates) are used in the performance of this Agreement;

    c.    Workers Compensation Insurance as statutory coverage is afforded as prescribed by the law of the state in which the Services are performed; Employees Liability Insurance in an amount not less than $500,000 per accident;

    d.    Professional Errors and Omissions Liability Insurance in an amount not less than $25,000,000; and

    e.    Excess Umbrella Liability/Coverage in an amount not less than $10,000,000.

6.3    All insurance policies procured by UNUMProvident shall:

    a.    be issued by insurance companies that hold a current rating of at least "A-,VII" according to Best's Key Rating Guide; and

    b.    be issued by insurance companies that are licensed to do business in the State of Tennessee.

6.4    UNUMProvident shall maintain a Blanket Fidelity Bond covering employee dishonesty, loss of property, forgery and alterations, and securities, computer fraud and wire transfer transactions, with limits of not less than $25,000,000 for each loss.

6.5    If requested by Recipient, UNUMProvident shall provide Recipient with certified copies of any and all policies or certificates of insurance executed by a duly authorized representative of the insurer evidencing the coverages, limits, and provisions specified above. If UNUMProvident is self-insured for the coverages listed in this Agreement, UNUMProvident shall give Recipient a written statement detailing the specific coverages it self-insures and any certificate number of self-insurance workers' compensation issued by a state insurance commission.

## 7.    PROPRIETARY INFORMATION

7.1    UNUMProvident agrees that UNUMProvident will disclose and furnish promptly to Recipient any and all business information (written or oral) as reasonably requested by Recipient, which was acquired by UNUMProvident during the term of this Agreement and which relates to Services performed by UNUMProvident under this Agreement.

7.2    Any business information or data, written, oral or otherwise, owned or controlled by Recipient furnished to or acquired by UNUMProvident under this Agreement shall remain Recipient's property. Unless such information was previously known to UNUMProvident free of any obligation to keep it confidential, or has been or is subsequently made public by Recipient or a third party or is required to be disclosed by UNUMProvident by law or by court order, such information shall be kept strictly confidential by UNUMProvident, shall be used only in performing Services under this Agreement, and shall not be used for other purposes except upon such terms as may be agreed upon between UNUMProvident and Recipient in writing.

## 8. INDEPENDENT CONTRACTOR STATUS

The parties agree that UNUMProvident is engaged in an independent business and will perform its obligations under this Agreement as an independent contractor and not as the employee, partner or agent of Recipient; that the Associates performing Services under this Agreement are not employees of Recipient; that UNUMProvident has and hereby retains the right to exercise full control of and supervision over the performance of UNUMProvident's obligations under this Agreement and full control over the employment, direction, compensation and discharge of all Associates assisting in the performance of such obligations; that UNUMProvident will be solely responsible for all matters relating to payment of such Associates, including compliance with workers' compensation, unemployment, insurance, social security, withholding and all other federal, state and local laws, rules and regulations governing such matters; and that UNUMProvident will be responsible for UNUMProvident's own acts and those of UNUMProvident's Associates during the performance of UNUMProvident's obligations under this Agreement. Notwithstanding the foregoing, from time to time Recipient may advise UNUMProvident of matters on which Associates shall have authority to act on behalf of Recipient and bind it in dealings with third parties.

## 9. AMENDMENT AND WAIVER

9.1    This Agreement may be amended, and any provision of this Agreement may be waived, provided that any such amendment or waiver shall be binding only if set forth in a writing executed by UNUMProvident and by Recipient.

9.2    No course of dealing between or among any persons having any interest in this Agreement will be deemed effective to modify, amend or discharge any part of this Agreement or any rights or obligations of any person under or by reason of this Agreement.

## 10. MEDIATION/ARBITRATION

10.1    Any dispute, controversy, claim, cause of action or failure to agree ("matter") arising out of or related to this Agreement shall be submitted first to confidential non-binding mediation at the request of either party. Non-binding mediation shall be conducted pursuant to the rules and procedures of a mediator licensed and chosen in accordance with the American Arbitration Association Guidelines and shall be held in the state of Tennessee.

10.2    In the event that the parties fail to resolve the matter through such mediation, the matter shall be submitted to final, confidential, binding arbitration in accordance with the commercial arbitration rules of the American Arbitration Association ("AAA"). Notwithstanding anything to the contrary in those rules, the following provisions shall apply to any such arbitration:

a.    The arbitration shall be conducted in the state of Tennessee before three arbitrators, one arbitrator to be selected by each party and the third arbitrator to be selected by the other two arbitrators.

b. Should a party fail to select an arbitrator within the time specified by the AAA, the AAA shall select an arbitrator for that party.

c. Arbitrators may be, but do not have to be, selected from the list of arbitrator candidates provided by the AAA.

d. The arbitrators' decision and award shall be agreed to by at least two of the three arbitrators, and shall be final, binding and conclusive on all parties.

e. Judgment may be rendered on the award upon application of either party to any court of competent jurisdiction.

f. The cost of such mediation and/or arbitration shall be borne and paid one-half (1/2) by each party.

## 11. MISCELLANEOUS

11.1 Except as otherwise provided in this Agreement, the provisions of this Agreement are for the benefit of Recipient and UNUMProvident and not for any other person. No third party rights are intended to be created hereby.

11.2 This Agreement shall be construed in accordance with the laws of Tennessee.

11.3 If any provision or any part of a provision of this Agreement is held invalid or unenforceable, such invalidity or unenforceability shall not invalidate or render unenforceable any other part of this Agreement or provision, but rather the entire Agreement or provision shall be construed as if not containing the particular invalid or unenforceable provision or portion thereof, and the rights and obligations of the parties shall be construed and enforced accordingly.

11.4 Provisions contained in this Agreement that by their sense and context are intended to survive completion of performance, termination or cancellation of this Agreement shall so survive.

11.5 This Agreement may be executed in any number of counterparts, but all of such counterparts together shall constitute one and the same Agreement.

11.6 This document and the Appendix attached hereto contain the complete agreement between the parties and supersede any prior understandings, agreements or representations by or between the parties, written or oral, which may have related to the subject matter hereof in any way.

11.7 All communications hereunder shall be in writing and sufficient if (i) delivered personally or (ii) sent by (a) facsimile or (b) registered or certified mail, postage prepaid, return receipt requested, addressed as follows:

If to UNUMProvident, to:    UNUMProvident Corporation
1 Fountain Square
Chattanooga, TN 37402
Attention:  Robert C. Greving
Telephone:  (423) 755-1309
Facsimile:  (423) 642-4260

If to Recipient, to:    UNUM Life Insurance Company of America
1 Fountain Square
Chattanooga, TN 37402
Attention:  F. Dean Copeland
Telephone:  (423) 755-6876
Facsimile:  (423) 763-6335

Notice given by mail shall be deemed given on the fifth (5th) day after deposit in the United States mail as described above.  Notice delivered personally shall be deemed given and received.  Either party may, by written notice, change the address to which notices to such party are to be delivered or mailed.

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by their respective duly authorized representatives.

**UNUMPROVIDENT CORPORATION**

By: _Robert C. Greving_

Name: _Robert C. Greving_

Title: _Senior Vice President – Finance and Chief Actuary_

Date: _December 29, 2000_

**UNUM LIFE INSURANCE COMPANY
OF AMERICA**

By: _J. Harold Chandler_

Name: _J. Harold Chandler_

Title: _Chairman, President and Chief Executive Officer_

Date: _December 29, 2000_

163097/3H¾H011.DOC
6/15/01 11:40 AM

11

# APPENDIX A
## LIST OF SERVICES TO BE RENDERED
## TO RECIPIENT BY UNUMPROVIDENT

**A.**    **Managerial and Administrative Support**

Provide managerial and administrative support functions to Recipient executives including facilities management, general counsel, internal audit, cash management, financial management, actuarial, pricing, and corporate relations.

**1.**    **Facilities Management**

Provide comprehensive facilities management functions including:

- Leasing activities for field offices
- Planning space and design
- Construction management
- Lease administration
- Housekeeping
- Roads/grounds
- Building maintenance and operation
- Security
- Utilities
- Distribution services (central & automated mail, shipping & receiving)
- Conference planning & travel services
- Conference room reservation services
- Maintain and purchase office supplies, furniture, and equipment
- Support food services
- Typesetting
- Electronic printing
- Bind documents
- Information management (records management)
- Storage services (hard copy files & microfilm/microfiche)
- Corporate apartments
- Aviation services

**2.**    **General Counsel**

Provide comprehensive legal services including:

A-1

- Legal advice regarding policyholder services, contracts, product development, ERISA and SEC approval of new product offerings, consumer complaints, examinations, agent licensing, mandated benefits, and reinsurance
- Initiate and defend lawsuits
- Investigate fraudulent activities (including criminal or non-compliant activities of insureds, policyholders, vendors, or employees)
- Litigate various issues (in areas such as employment, investments, real estate, agents, brokers, bankruptcy, or SEC regulations)
- Take depositions
- Review contracts
- Monitor management incentives
- Engage and monitor third-party law-service providers
- Review and research regulatory/legal material and evaluates new regulations to determine effect on policy forms and procedures
- Respond to state insurance department inquiries
- Develop policy forms and applications that comply with specification requirements from various departments (i.e. state insurance department, claims department, marketing departments)
- Draft contract language
- Review all advertising materials
- Corporate ethics
- Market conduct examinations and issues related thereto
- Propac
- Legal coordination for mergers and acquisitions
- Tax issues related to products
- Intellectual property
- Lobbying and legislative initiatives
- Employee benefit plans

3. **Internal Audit**

Provide comprehensive internal audit services including:

- Perform scheduled home office and field audits (typically including surveys, preliminary field work, testing, report writing, exit interviews, and evaluation of responses) based on audit risk assessment
- Assess the audit risk within the organization on an annual basis
- Assist with external audits
- Conduct special audits and projects as requested by management or the Board of Directors
- Consult with management on an ad-hoc basis

A-2

4.  **Cash Management**

Provide comprehensive finance-treasury functions, including:

- Perform quarterly debt compliance calculations
- Manage funds on a daily basis (including following daily inflows/outflows of cash; setting end (target) balances based on transactions; managing costs for the different bank systems, performing wire and ACH transfers, and reporting)
- All cash management functions will be carried out in compliance with procedures and limitations established by the Recipient. Any short term borrowing, lending or investments will be made in compliance with applicable statutes and regulations. The terms of any inter-company transactions between the Recipient and any other member of PCI's holding company system will be fair and equitable. .

5.  **Financial Management**

Provide comprehensive finance services with respect to operations, including,

- Investment accounting
- Financial planning and analysis
- Establish controls over derivatives
- Provide new investment analysis
- Prepare and analyze earnings statements, balance sheets, and monthly financial statements
- Perform market research, planning functions, and projections for product lines
- Financial support for mergers, acquisitions, and divestitures
- Provide needed accrual and statutory accounting support
- Review accounting procedures and controls of functional areas,
- Deferred policy acquisition cost accounting and analysis
- Internal and external reporting (including statistics, tax, and GAAP)
- Annual statement work
- Survey work for Provident's product lines
- Ensure compliance with federal/state/local/foreign tax laws (including daily depositing of federal payroll taxes, and other tax withholding and reporting functions)
- Respond to federal and state tax audits of prior years (including administrative appeals and litigation)
- Corporate planning and budgeting activities (including Activity Based Costing)
- Corporate, product, and policyholder tax planning

A-3

- Technical support for the corporate operations (including corporate restructuring and financial systems support)
- Process corporate payroll for Recipient employees

6.  **Actuarial**

- Report and certification of actuarial reserves
- Rating agency leverage analysis and surplus planning
- Business analysis studies
- Analyze growth and interest rate spreads of retained assets
- Determination and implementation of reinsurance strategy

7.  **Pricing**

- Building and maintaining liability models for pricing use
- Monitor profitability in products
- Risk management
- Assumption development
- Pricing all existing and new products
- Getting approval by state insurance departments to sell our products in their respective states
- Keeping current with regulatory changes
- Provide input to the product development process

8.  **Corporate Relations**

Provide comprehensive corporate relations services including:

- Employee communications including publishing the Bridge, the weekly Monday, and the Employee News Bulletins
- Communications with financial community (investors, analysists, rating agencies)
- Develop annual and quarterly reports to shareholders (10Q and 10K)
- Manage outside public relations firm
- Public relations, community relations, charitable contributions, corporate communications

B.  **Marketing and Product Support**

1.  **Client Services**

Provide comprehensive client services including:

A-4

- Provide customer service, billing, premium collection and accounting, and commission reporting
- Issue applications and policies
- Maintain accounts, billing and collection, and answering account inquiries
- Maintain records (including general filing (correspondence, request for disbursements, check copies, applications), answering written or verbal inquiries, processing payments including paying and setting-up for payment
- Licensing and appointing brokers and paying their commissions, and crediting premiums to policyholder accounts
- Answer customer inquiries, manage a support center, update policies, process mail, research, maintain records, convert contracts, exchanges, maintain customer telephone log, and disbursements
- Work with other functional areas (including ISS, to manage Provident Life and Accident Notebook Enrollment)
- Prepare applications for imaging, checks PLANE disks, and perform microfilming, indexing, scanning, retrieving, and filing activities

## 2.    Sales Management

Provide comprehensive sales and marketing services and management, including:

- Provide through sales development and support, advertising and promotion and coordinated sales capabilities to certain customer groups
- Assist Market/Product Development in providing direct feedback about products from brokers and customers
- Participate in prospecting and recruiting new clients (which involves developing and mailing marketing and advertising materials, attending regional and national marketing meetings, updating proposal software, conducting sales calls, building client relationships, and preparing and giving presentations)
- Oversee Request For Proposal ("RFP") completion
- Prepare sales plans and budgets
- Maintain customer relationships and ensure customer and broker/consultant satisfaction
- Account management
- Perform consultative services
- Implement new sales
- Develop product sales plans
- Assist product implementation
- Organize various technology functions (including testing and trouble-shooting systems problems, overseeing programming, determining

software needs, answering field questions, and training field agents on new software enhancements)

- Create sales illustrations
- Answer agent inquiries
- Develop and mail marketing material
- Organize sales meetings
- Develop sales incentives/contests
- Track sales
- Generate management reports
- Advertise through print and media

3.  **Market Development**

    a. **Market Development**

    Provide comprehensive marketing services including:

    - Identify and develop business plans for penetration of desirable target markets and integrate developmental opportunities between markets
    - Provide superior market research skills through use of internal and external resources, use focus groups, surveys, research and segment management methodologies
    - Design, develop, and implement new product offerings for individual and corporate customers
    - Evaluate product and service offerings against those of competitors and ensuring appropriate market acceptance of pricing and company positioning
    - Design and manage an integrate producer compensation program
    - Actively promote products and services of the company through effective marketing communications and targeted advertising initiatives
    - Monitor marketing procedures and offerings in an ongoing way to ensure maximum generation of quality revenue and market segment penetration for the company

4.  **Claims**

    Provide comprehensive claims management services, including:

    - Review claims and medical files, determine if claims are payable, maintain and search databases, interview doctors, attorneys, employers, and employees, and process claims for payment
    - Answer inquiries (written and oral)
    - Develop internal and external monthly reports (such as mortality profit reports, death records, state reports, and management reports)

    A-6

- Receive, sort, and microfilm mail and taxes, maintain postage equipment, develop and proof film, and retrieve files from the film

5.    **Underwriting**

Provide comprehensive underwriting functions, including:

**a. Individual Policies**

- Determine whether applicant's request for coverage is accepted or rejected
- Determine premiums that should be assessed (based on a review of medical, financial, occupational, avocation and lifestyle information submitted by applicants)
- Determine the level of risk and the rate that a policy should be assigned

**b. Group Policies**

- Review proposals and forward them to appropriate issuing agent
- Determine whether to issue policies to applicants (and if so, determine whether to assess a rated premium)
- Assess and renew contracts and policies
- Review medical files and research medical databases on an on-going basis

5.    **Systems Support**

Provide comprehensive systems support, including:

- Answer user inquiries and conduct user training
- Tune and install new versions of software and hardware, change management, and modify systems for the year 2000
- Develop new products, install new cases, and respond to service requests

All services on which state sales tax will be collected are marked with an *.

A-7

# APPENDIX B

## Cost Allocation Methodology

[attach accounting proposal on methodology,
e.g., hours, etc.]

| AreaName | Driver |
|---|---|
| Actuarial - Chief Actuary/Experience Analysis | Number of Hours |
| Actuarial - DI & Life Products | Budget expenses per product |
| Actuarial - Employee Benefits | Budget expenses per product |
| Actuarial - Financial Products | Budget expenses per product |
| Cash Management - Corp Insurance | Number of FTEs |
| Cash Management - Inv Treasury | Percent of Expense |
| Cash Management - Op Treasury | Invested Assets |
| CFO | Number of Corp Admin FTEs |
| Claims - Claims Investigation | Number of Investigations |
| Claims - Group Disability | Avg Monthly Open Claims + New |
| Claims - Group Life-AMA | Number of Finalized Claims |
| Claims - Group Life NonAMA | Number of Finalized Claims |
| Claims - Individual Disability | Avg Monthly Open Claims |
| Claims - Individual Life | Number of Paid Claims including Waivers |
| Client Svc - Annuities (Chatt.) | Number of Contracts in Force |
| Client Svc - Annuity(Worcester) | Number of Contracts in Force |
| Client Svc - Employee Benefits-Chatt.-CTA | Number of Bill Units |
| Client Svc - Employee Benefits-Chatt.-Non CTA | Number of Bill Units |
| Client Svc - Field Admin Services | Number of Service Requests |
| Client Svc - Group(Worcester) | Number of Bill Units |
| Client Svc - Indiv DI (Chatt.) | Number of Policies in Force |
| Client Svc - Indiv DI(Worcester) | Number of Policies in Force |
| Client Svc - Indiv New Busin | Number of New Applications |
| Client Svc - Individual Life | Number of Policies in Force |
| Client Svc - Voluntary Benefits | Number of Policies in Force |
| Corporate Activities-Bus Sust | Business Sustaining |
| Corporate Activities-Incentives | Number of FTEs |
| Corporate Activities-Ret PlanAdj | Not Allocated to Products |
| Corporate Relations | Business Sustaining |
| Corporate Risk Management | Number of Risk Mngt FTEs |
| Excess Reinsurance | Number of Policies in Force |
| Executive | Business Sustaining |
| Expert Systems | Number of Hours |
| Facilities Management - Automated Mail | Number of Pieces of Mail |
| Facilities Management - Centralized Mail | Number of Home Office FTEs |
| Facilities Management - COPAT | Number of COPAT Transactions |
| Facilities Management - Corporate Apt. | Business Sustaining |
| Facilities Management - Employee Subsidies | Number of Home Office FTEs |
| Facilities Management - EPF | EPF Charges |
| Facilities Management - Facilities | Number of Home Office FTEs |
| Facilities Management - Flight Operations | Business Sustaining |
| Facilities Management - Purchasing Svcs | Number of Transactions |
| Facilities Management - Real Estate | Number of Leases |
| Facilities Management - Records Mngt | Records Mngt Charges |
| Facilities Management - Shipping & Receiving | Number of FTEs |
| Fin Mgmt - Finan Res (Accounting Services) | Business Sustaining |
| Fin Mgmt - Finan Res (Accounting Systems) | Business Sustaining |
| Fin Mgmt - Finan Res (Investments) | Investment Expense |
| Fin Mgmt - Finan Res (Payroll) | Number of FTEs |
| Fin Mgmt - Finan Res (Reinsurance) | Number of Hours |
| Fin Mgmt - Finan Res (Reporting - Group) | In Force Premiums |
| Fin Mgmt - Finan Res (Reporting - Individual) | In Force Premiums |
| Fin Mgmt - Finan Res (Reporting) | Business Sustaining |
| Fin Mgmt - Finan Res (Tax) | Business Sustaining |
| Fin Mgmt - Financial Planning | Business Sustaining |
| Financial Resources Mgmt | Business Sustaining |
| General Counsel-Compliance | Number of Hours |
| General Counsel-I&S of Claims Direct | External Legal Hours-I&S |
| General Counsel-Internal Legal Dept | Number of Hours |
| General Counsel-Legal Fees General Direct | External Legal Hours-General |

| AreaName | Driver |
|---|---|
| General Counsel-Legal Fees Investment | External Legal Hours-Investment |
| General Counsel - Internal Legal Business Sust | Business Sustaining |
| Human Resources - Other HR | Number of FTEs |
| Human Resources - Sales Incentive | Number of Eligible Field FTEs |
| Human Resources - Sales Training | Number of Sales Mgmt FTEs |
| Internal Audit - Investment | Number of Hours |
| Internal Audit - NonInvestment | Number of Hours |
| Investment-Trading | Investment Expense |
| ISS - Corporate Systems | Percent of Expense |
| ISS - Disab & Annuity Systems | Number of Hours |
| ISS - Distributed Computing - Other | Number of Home Office FTEs |
| ISS - Distributed Computing - Telecomm | Telecomm Charges |
| ISS - Empl Ben & Life Sytems-EDP Software Amort. | Number of Dollars |
| ISS - Empl Ben & Life Sytems-Non Amort | Number of Hours |
| ISS - Mainframe Services | Mainframe Charges |
| ISS - Other-App Dev (Fiacco) | Number of IDA, IEB, & ICS FTEs |
| ISS - Other-CIO (to ISS & CI Svcs) | Number of CS & ISS FTEs |
| ISS - Other-Yr2000, DA, Sys Sec (ISS) | Number of ISS FTEs |
| ISS - Sales Support | Number of Hours |
| Market Development (Adv & Promotion) | Budget expenses per product |
| Market Development (Corp Prd Mngt) | Annualized New Paid Premiums |
| Market Development (Ind Prd Mngt) | Annualized New Paid Premiums |
| Market Development (Mkt Research) | Annualized New Paid Premiums |
| Market Development (VP Corp Dev) | Number of Mkt Dev FTEs |
| Medical Stop Loss | Number of Cases Quoted |
| Portfolio Strategy - A/L Management | Invested Assets |
| Portfolio Strategy - Pricing | Number of Hours |
| Sales Mgt-Career & PPGA | Annualized New Paid Premiums |
| Sales Mgt-Corp Sales Management | Number of Sales Mngt FTEs |
| Sales Mgt-Inc Comp Group | Annualized New Paid Premiums |
| Sales Mgt-Inc Comp Ind DI | Annualized New Paid Premiums |
| Sales Mgt-Inc Comp Spec Mkts | Annualized New Paid Premiums |
| Sales Mgt-Inc Comp VB | Annualized New Paid Premiums |
| Sales Mgt-National Accounts | Annualized New Paid Premiums |
| Sales Mgt-National Accounts - Direct | Budgeted Direct Expenses |
| Sales Mgt-Region Sales | Annualized New Paid Premiums |
| Sales Mgt-Sales Admin | Annualized New Paid Premiums |
| Sales Mgt-Sales Support/Service | Annualized New Paid Premiums |
| Sales Mgt-Special Mkts-AMA | Annualized New Paid Premiums |
| Sales Mgt-Special Mkts-AMA Direct | Budgeted Direct Expenses |
| Sales Mgt-Special Mkts-Other | Annualized New Paid Premiums |
| Sales Mgt-Special Mkts-PAS | Annualized New Paid Premiums |
| U/W - Group (Chatt.) - AMA | Number of Hours |
| U/W - Group (Chatt.) - NonAMA | Number of Proposals |
| U/W - Group (Worc.) | Number of Proposals |
| U/W - Indiv DI (Chatt.) DI - Vice President Individual U/W | Percent of Effort |
| U/W - Indiv Life & DI - Medical Requirements | Number of Applications |
| U/W - Indiv Life & DI (Chatt.) - AMA | Number of Applications |
| U/W - Indiv Life & DI (Chatt.) - CTA | Number of Applications |
| U/W - Indiv Life & DI (Chatt.) - Life | Number of Applications |
| U/W - Indiv Life & DI (Chatt.) - Medical | Number of Policies Reviewed |
| U/W - Indiv Life & DI (Chatt.) -GUS | Number of Applications |
| U/W - Individual DI (Chatt & Worc) | Number of Applications |
| U/W - Medical (Worc.) | Number of Apps/Claims Reviewed |

# APPENDIX C

## Physical Assets

EDP Hardware & Software

#17256V6

A-9