UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

DOCKET NO.:

| | | |
|---|---|---|
| LEE B. KAUFFMAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| UNUM LIFE INSURANCE | ) | EXHIBIT C |
| COMPANY OF AMERICA, | ) | |
| UNUM GROUP, | ) | |
| DRAKE BEAM MORIN, INC. LONG TERM | ) | |
| DISABILITY PLAN | ) | |
| | ) | |
| Defendants. | ) | |

**IN THE MATTER OF**

**UNUM LIFE INSURANCE COMPANY OF AMERICA**
**Portland, Maine**

**REGULATORY SETTLEMENT AGREEMENT**

**TARGETED MULTISTATE DISABILITY**
**INCOME MARKET CONDUCT EXAMINATION**

This Regulatory Settlement Agreement ("Agreement") is entered into as of this ___ day of November, 2004, by and between Unum Life Insurance Company of America (the "Company"), the Superintendent of the State of Maine Bureau of Insurance (the "Lead Regulator"), the Commissioner of the Tennessee Department of Commerce and Insurance, and the Commissioner of the Massachusetts Division of Insurance (collectively with the Lead Regulator, the "Lead Regulators"), the insurance regulators of each of the remaining States, the District of Columbia and American Samoa that adopt, agree to and approve this Agreement (the "Participating Regulators") and the United States Department of Labor (the "DOL").

## A. Recitals

1. The Company maintains its home office at Portland, Maine. At all relevant times, the Company has been a licensed insurance company domiciled in the State of Maine. The Company and its affiliates Provident Life and Accident Insurance Company and Provident Life and Casualty Insurance Company (collectively "Provident") and The Paul Revere Life Insurance Company ("Revere") are subsidiaries of UnumProvident Corporation, a Delaware corporation, with its principal place of business in Chattanooga, Tennessee (the "Parent Company"). At all relevant times, Provident is and has been a licensed insurance company domiciled in the State of Tennessee, and Revere is and has been a licensed insurance company domiciled in the Commonwealth of Massachusetts. The Company, Provident, and Revere, are collectively referred to as the "Companies."

2. On September 2, 2003, the Lead Regulators of the domiciliary states of the Companies, Maine, Massachusetts, and Tennessee called a multistate targeted market conduct examination of the Company, Provident Life and Accident Insurance Company and Revere (the "Multistate Examination") to determine if the individual and group long term disability income claim handling practices of the Companies reflected systemic "unfair claim settlement practices" as defined in the National Association of Insurance Commissioners ("NAIC") *Unfair Methods of Competition and Unfair and Deceptive Acts and Practices in the Business of Insurance Model Act (1972*) or *NAIC Claims Settlement Practices Model Act* (1990) (collectively, the "Model Act") pursuant to the procedures established by the *NAIC Market Conduct Examiner's Handbook* (the "Handbook").

3. The other forty-seven states, the District of Columbia and American Samoa chose to be "Participating States" in the Multistate Examination. Contemporaneously

with the Multistate Examination, the DOL was conducting an investigation of the Companies (the "DOL Investigation") pursuant to Section 504 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. Section 1134.

4. As a result of the Multistate Examination, the Lead Regulators engaged in discussions with the Companies with respect to regulatory concerns raised by the Multistate Examination, a plan of corrective action by the Companies to address those concerns for the benefit of the Companies' current and former policyholders and insureds, and a means of providing for the enforcement of such a plan. After extensive discussion, the Companies agreed to a plan of corrective action to be set forth in this Agreement and substantially identical regulatory settlement agreements between each of Provident and Revere and their respective domiciliary regulators and to the payment of a $15,000,000 fine. In addition, the insurance subsidiary of the Parent Company domiciled in New York, First Unum Life Insurance Company (the "New York subsidiary"), will enter into a substantially identical regulatory settlement agreement with the New York Superintendent of Insurance and the Lead Regulators. As the result of the ongoing Multistate Examination and the DOL Investigation, the Companies, the DOL and the Lead Regulators decided to enter into a global settlement resolving common matters pertaining to the Multistate Examination and the DOL Investigation. An Examination Report concerning the Multistate Examination is being released concurrently with this Agreement that contemplates the execution of this Agreement and/or the entry of consent orders where necessary under the law or practice of a particular Participating Regulator's state.

5. The plan of corrective action addresses a number of regulatory and statutory concerns raised by the Lead Regulators and the DOL. It seeks to accomplish the following:

a. provide an effective Claim Reassessment Process for an identified class of claimants who seek review of the earlier decision using an experienced claim unit formed by the Companies solely for this purpose to (i) perform a de novo review of the claims using past and current information that is relevant to the claim decision and (ii) apply the improved claim handling procedures contemplated by this Agreement in order that this Claim Reassessment Process constitute a fair way in which to remedy deficiencies that may have affected the earlier claim decisions covered by this Agreement;

b. provide changes to claim procedures that will improve the claim handling process and benefit current and future policyholders and insureds by (i) reflecting regulatory standards in the area of market conduct for handling disability claims, (ii) addressing the Companies' commitment to claim handling procedures that promote the fair, objective and thorough treatment of claims and be indicative of best practices in the handling of individual and group long term disability claims, and (iii) complying with applicable state and federal laws and regulations; and

c. provide for oversight in order to ensure compliance or effect enforcement, which oversight and ongoing monitoring includes (i) additions to the governance

structure of the Parent Company and (ii) review by the Lead Regulators and the DOL so that activities of the Companies hereunder and reviews by staff or examiners of the Lead Regulators and the DOL will result in quarterly reporting on the results of the Claim Reassessment Process and generally on the handling of individual and group long term disability claims and appropriate follow-up to resolve questions or correct any potential non-compliance with policies or procedures.

6. This Agreement sets forth (i) the plan of corrective action, (ii) provisions concerning the enforcement of the Company's compliance with the plan of corrective action, and (iii) other miscellaneous provisions of this Agreement.

7. Location of Definitions. Listed definitions are contained in this Agreement unless there is specific reference to the definition being in an Exhibit or Attachment to an Exhibit to this Agreement.

a. "Agreement" is defined in the preamble paragraph.

b. "AP" is defined in paragraph B.3.c.(i)

c. "Applicable Consent Order" is defined in paragraph C.5.c.

d. "Board of Directors" is defined in paragraph B.1.a.

e. "Claim Reassessment Process" is set forth in paragraph B.2.

f. "Claim Reassessment Unit" is defined in paragraph B.2.a.

g. "Company" is defined in the preamble paragraph.

h. "Companies" is defined in paragraph A.1.

i. "DOL" is defined in the preamble paragraph.

j. "DOL Investigation" is defined in paragraph A.3.

k. "ERISA" is defined in paragraph A.3.

l. "FCE" is defined in paragraph B.3.c.(i)

m. "Governance Implementation Date" is defined in paragraph B.1.a.

n. "Group" is defined in paragraph B.3.j.

o. "Handbook" is defined in paragraph A.2.

p. "IME" is defined in paragraph B.3.c.(i)

q. "Implementation Date" is defined in paragraph B.2.a.

r. "Lead Regulator(s)" is defined in the preamble paragraph.

s. "Model Act" is defined in paragraph A.2.

t. "Multistate Examination" is defined in paragraph A.2.

u. "New York subsidiary" is defined in paragraph A.4.

v. "NAIC" is defined in paragraph A.2.

w. "Parent Company" is defined in paragraph A.1.

x. "Participating Regulators" is defined in the preamble paragraph.

y. "Plan" is defined in the heading to paragraph B.

z. "Regulatory Compliance Committee" is defined in paragraph B.1.c.

aa. "Requesting Claimant" is defined in paragraph B.2.b.

bb. "Specified Claimant" is defined in paragraph B.2.b.

## B. Plan of Corrective Action (the "Plan")

1. <u>Changes in Corporate Governance</u>

a. <u>Expansion of Board of Directors</u>. The Lead Regulators, and the Board of Directors of the Parent Company (the "Board of Directors") have agreed that additional members with specific experience and qualifications shall be added to the Board of Directors. (Prior to entering this Agreement the Board of Directors directed a search using an outside search firm to identify candidates with senior management experience in the insurance or financial services industries and on August 12, 2004 elected three new independent directors with such qualifications.) The Board of Directors shall be expanded by the addition of three other directors who shall be "independent" directors under current rules of the New York Stock Exchange. In the first instance, two directors will be added, each of whom will have significant insurance industry or insurance regulatory experience, and they will be approved by the Lead Regulators. The Company shall provide the names of the two prospective new members of the Board of Directors to the Lead Regulators by November 19, 2004. If the two proposed new members are approved by the Lead Regulators prior to December 15, 2004, they will be elected by the Board of Directors no later than December 16, 2004. However, if either or both of the two proposed new members is disapproved, the Board of Directors will continue in good faith to search to identify to the Lead Regulators as promptly as reasonably practicable (but no later than 60 days from the date of such disapproval) one or two additional qualified

candidates, as appropriate, to propose as members of the Board of Directors. Following their approval by the Lead Regulators, such person or persons shall be elected by the Board of Directors at its next regularly scheduled meeting. The date of the election of the second of the two new members to the Board of Directors will be the "Governance Implementation Date", unless the two new members approved by the Lead Regulators are elected to the Board of Directors prior to November 19, 2004, in which case the Governance Implementation Date will be December 16, 2004. In addition to the two directors described above, the Board of Directors undertakes that the next following person to be added to the Board of Directors as a result of the retirement, resignation, death or failure to stand for reelection of an existing director or to fill an existing or newly-created vacancy will be a person with significant insurance regulatory experience. In any event, a person with such qualifications will be proposed by the Board of Directors for board membership and such person's name shall be provided to the Lead Regulators no later than June 30, 2005. If the Lead Regulators approve the proposed new member, the person will be elected to the Board of Directors at the next regular meeting of the Board of Directors following approval. If the Lead Regulators disapprove the proposed new member, the Board of Directors will continue in good faith to search to identify as promptly as reasonably practicable (but no later than 60 days from the date of such disapproval) a person with such qualifications to propose as a member of the Board of Directors. Following the candidate's approval by the Lead Regulators, the person will be elected to the Board of Directors at its next regularly scheduled meeting. If any of the new directors ceases to serve as a director prior to the end of the term of this Agreement, the process described in this paragraph shall be applied to the selection of any replacement.

b. <u>Audit Committee</u>. No later than the Governance Implementation Date, at least one of the new directors referenced in paragraph B.1.a. will be appointed to the Audit Committee.

c. <u>Creation of Regulatory Compliance Committee</u>. No later than the Governance Implementation Date, the Board of Directors shall establish a new standing committee that shall consist of the two new directors and three existing independent directors, the "Regulatory Compliance Committee". The responsibilities of the Regulatory Compliance Committee shall include monitoring and reporting to the Board of Directors regarding the Parent Company and its subsidiaries' compliance with applicable laws concerning market conduct, Title 1 of ERISA, and the Companies' compliance with the Plan, along with such other matters as may be authorized or delegated by the Board of Directors to assist the Board in the discharge of its fiduciary duties and responsibilities.

d. <u>Creation of Regulatory Compliance Unit</u>. No later than the Implementation Date, the Parent Company shall form a new Regulatory Compliance Unit of officers or employees of the Parent Company or its subsidiaries who shall not be members of the Claim Reassessment Unit discussed below. The Regulatory Compliance Unit shall report directly to the Regulatory Compliance Committee (or to the Board of Directors until such Committee is appointed) with respect to all market-conduct matters and ERISA requirements. The responsibilities of the Regulatory Compliance Unit shall include (i)

monitoring compliance with applicable laws concerning market conduct and ERISA requirements, (ii) monitoring compliance with the Plan (including the functions of the Claim Reassessment Unit) through the performance of periodic audits, (iii) providing assistance to claimants upon request that will ease and facilitate the claim submission process, and (iv) gathering data to facilitate the Lead Regulators' and the DOL's ongoing monitoring of the Companies' compliance with the Plan. The Regulatory Compliance Unit shall be managed by an officer who is an experienced insurance professional, whose experience includes compliance related matters. Employees of the Parent Company and all of its subsidiaries shall be provided with a toll free hotline number to confidentially report concerns respecting claim handling, such reports to be provided to the manager of the Regulatory Compliance Unit. Claimants shall be provided with a toll free hotline number for assistance throughout the claim handling process, the performance of which will be monitored by the Regulatory Compliance Unit. A log of all telephone calls to both hotline numbers shall be maintained, and quarterly reports concerning such logs shall be provided to the Regulatory Compliance Committee.

e. Quarterly Board Committee and Management Meetings with Lead Regulators and the DOL. During each calendar quarter beginning with the regular quarterly meeting of the Board of Directors following the Governance Implementation Date, the Regulatory Compliance Committee and the management of the Company shall each meet separately with the Lead Regulators to evaluate compliance with the Plan. The DOL shall receive notice of these quarterly meetings and may attend as it deems appropriate. The Lead Regulators shall update Participating Regulators concerning these meetings through the NAIC on a quarterly basis.

2. Claim Reassessment Process

a. Formation of Claim Reassessment Unit. Thirty (30) days after approval of this Agreement by the Company , the Lead Regulators, the DOL and no less than two-thirds of the Participating States in the Multistate Examination, unless a lesser number is agreed to by the Companies (and assuming approval of substantially identical regulatory settlement agreements between each of Provident and Revere and their respective domiciliary regulators, and the execution of a substantially identical regulatory settlement agreement between the New York subsidiary, the New York Superintendent of Insurance and the Lead Regulators) (the "Implementation Date"), the Company shall form a claim reassessment unit staffed with experienced claim representatives to handle further review of previously denied or terminated individual and group long term disability claims that are resubmitted under this paragraph (the "Claim Reassessment Unit"). The Claim Reassessment Unit shall be managed by an experienced claim manager and shall report to the most senior executive in charge of claim operations. The Claim Reassessment Process, unit structure and operating procedures of the Claim Reassessment Unit, developed in consultation with and approved by the Lead Regulators and the DOL, are described in Exhibit 1 attached hereto. Staffing of the Claim Reassessment Unit shall be adjusted appropriately from time to time so that claim decisions are made in a timely manner in accordance with the operating procedures set forth in Exhibit 1.

b. <u>Implementation of Claim Reassessment Process</u>. Beginning earlier and ending no later than the fifteenth business day following the Implementation Date, the Companies shall mail a notice (in the form of Attachment A-1 to Exhibit 1) to all of the Specified Claimants advising that they may resubmit their claim for further review by the Claim Reassessment Unit established for that purpose. "Specified Claimant" means any claimant of one of the Companies or any claimant of the New York subsidiary, who presented a claim for group or individual long term disability benefits, and whose claim was denied or whose benefits were terminated on or after January 1, 2000 and prior to the Implementation Date for reasons other than the following: (i) death of the claimant, (ii) claim was withdrawn, (iii) claimant did not satisfy the elimination period, or (iv) maximum benefits were paid, and also excludes (x) a claimant who had his or her claim resolved through litigation or settlement, or (y) a claimant who has pending litigation against the Company challenging the denial or termination of his or her claim, which lawsuit was filed after the date of receipt of notice of the Claim Reassessment Process or a claimant whose lawsuit was filed prior to the date of receipt of notice of the Claim Reassessment Process in which lawsuit there has been a verdict or judgement on the merits prior to completion of the reassessment on the claim. Specified Claimants whose claims were denied or benefits terminated due to a return to work shall receive a special notice in the form of Exhibit 1, Attachment A-2 . The Claim Reassessment Process will be available to:

1. Any of the Specified Claimants who elect to participate within the time period set forth in Exhibit 1; and

2. Any other group or individual long term disability claimant of one of the Companies (or of the New York subsidiary) whose claim was denied or whose benefits were terminated prior to January 1, 2000 and who requests participation in the Claim Reassessment Process, provided that any such denial or termination of benefits took place no earlier than January 1, 1997 and the claimant would otherwise be included with the definition of "Specified Claimant" except for the application of the January 1, 2000 date; and

3. Any other group or individual long term disability claimant of one of the Companies (or of the New York subsidiary) whose claim was denied or whose benefits were terminated on or after January 1, 1997 and prior to the Implementation Date, who disputes the Companies' characterization on any rational basis that such denial or termination falls into any of the reasons outlined in (i) – (iv) of the definition of "Specified Claimant" and who requests to participate in the Claim Reassessment Process.

Any claimant who requests to participate pursuant to subparagraphs 2. or 3. above shall be referred to herein as a "Requesting Claimant". The initial notice will inform each Specified Claimant (i) how to communicate to the Company his or her election to participate and the time period in which to respond, (ii) that he or she will be sent an acknowledgement of their election to participate, (iii) that the Claim Reassessment Process will review claims based on the original dates of their closure or denial with the oldest claims being reviewed first, (iv) that after electing to participate, a subsequent

notice (Attachment B to Exhibit 1) will be sent at a time that is closer to the period when his or her claim will be reviewed indicating the approximate time period of that review and seeking information on a Reassessment Information Form (Attachment C to Exhibit 1) to support the Claim Reassessment, (v) that receipt of a completed Reassessment Information Form will be acknowledged, and (vi) that by electing to have his or her claim reassessed, the claimant conditionally agrees to forego the pursuit of a legal action as specified in paragraph B.2.d. The phased approach to review and follow up notices are intended to provide Specified Claimants and Requesting Claimants who elect to have their claim reviewed a better indication of the timing of that review and when to expect a decision. In conducting all reviews, including but not limited to reviews conducted pursuant to the Claim Reassessment Process, the Companies must give significant weight to evidence of an award of Social Security disability benefits as supporting a finding of disability, unless the Companies have compelling evidence that the decision of the Social Security Administration was (i) founded on an error of law or an abuse of discretion, (ii) inconsistent with the applicable medical evidence, or (iii) inconsistent with the definition of disability contained in the applicable insurance policy. The Company shall maintain its records so that the filing and results of the Claim Reassessment Process may be tracked on a state-by-state basis as well as on a group basis.

4. The Company commits to use its best efforts to complete the Claim Reassessment Process by December 31, 2006, although, for good cause shown, the Lead Regulators and the DOL may agree to extend the time for completing that process.

c. Monitoring of Claim Reassessment Process. The Regulatory Compliance Unit shall conduct or cause to be conducted ongoing audits of the Claim Reassessment Process and report its findings to the Regulatory Compliance Committee, the Lead Regulators, the DOL and senior management at least quarterly. The Lead Regulators shall monitor the Claim Reassessment Process and shall conduct examinations of the Claim Reassessment Unit decisions in the manner and at such intervals as they deem appropriate. The DOL may monitor the Claim Reassessment Process and conduct examinations of the Claim Reassessment Unit as it deems appropriate. The results of the internal audits directed by the Regulatory Compliance Unit and the reviews of claim reassessment decisions directed by the Lead Regulators will be reviewed at the quarterly meetings contemplated by paragraph B.1.e. above in order to specifically evaluate the ongoing performance of the Claim Reassessment Process. Any cases reported by the Regulatory Compliance Unit or by the Lead Regulators at the quarterly meetings that have not resolved an identified potential error or claim handling practice that is non-compliant will be promptly addressed by further review of the Claim Reassessment Unit and reported on at the next quarterly meeting. The Lead Regulators shall meet quarterly with the Regulatory Compliance Committee and senior management of the Companies to review the status of the Claim Reassessment Process. The DOL shall receive notice of these meetings and may attend as it deems appropriate.

d. Effect on Litigation. This Agreement neither imposes any obligations upon, nor takes away any rights of, any claimant who chooses not to resubmit for reassessment his or her previously denied or terminated claim for benefits. Rather, the purpose of the

Claim Reassessment Process provided for under this Agreement is to offer an entirely optional method for claimants who wish to have their claims reassessed under these procedures. If a claimant does decide to resubmit his or her claim for reassessment, however, then the Company may require such claimant to agree that if (and only if) the reassessment results in a reversal or other change in the prior decision denying or terminating benefits, then such claimant shall not pursue any legal action to the extent (and only to the extent) such action is based on any aspect of the prior denial or termination that is reversed or changed. If the Company does so require, then any applicable statutes of limitations shall be tolled during the pendency of the Claim Reassessment Process. A copy of this Agreement shall be the only evidence required of such tolling. If a claimant has pending litigation against the Company, is eligible under this Agreement to participate in the Claim Reassessment Process and decides to resubmit his or her claim for reassessment, then the Company may require the claimant to (i) take such action as is necessary to stay such litigation pending the Claim Reassessment Process, if the court will agree to such a stay, and (ii) agree that if (and only if) the reassessment results in a reversal or other change in the prior decision denying or terminating benefits, then such claimant shall withdraw any litigated claim, including any extra-contractual claims, to the extent (and only to the extent) such claims are based on any aspect of the prior denial or termination that is reversed or changed. That is, to the extent that following the reassessment there remains a complete or partial denial of benefits, a claimant's right to initiate or continue litigation regarding that portion of the prior denial that has not been reversed or changed shall not be waived. As to any such claimant in whose litigation a final verdict or judgement is entered prior to completion of the claimant's reassessment, the Company's obligation to conduct and/or complete the Claim Reassessment Process pursuant to this Agreement shall cease.

     3. <u>Changes in Claim Organization and Procedures</u>

     a. <u>Changes in Claim Organization.</u> The Company's claim organization shall include the following ongoing objectives:

     (i) Engagement of experienced claim personnel at the earliest stage of reviewing a claim;

     (ii) Increased emphasis upon claim staff accountability for compliance with the terms of insurance          policies and applicable law;

     (iii) Increased involvement of higher levels of management in claim denial and benefit termination          decisions through approval requirements;

     (iv) Creation of a separate compliance-accountability function at the claim denial and benefit          termination level focusing on compliance, documentation, accountability for compliance, whether          the claimant has been treated fairly under the circumstances, and any action that may be construed          as an instance of an improper claim practice.

No later than the Implementation Date, the Company shall implement changes to its claim organization consistent with the foregoing objectives and developed in consultation with the Lead Regulators and the DOL as described in Exhibits 2 and 3 hereof.

b. <u>Communications with Appeals Personnel</u>. Company personnel (including but not limited to claims handling personnel) shall not interfere with nor attempt in any way to influence other Company personnel involved with the separate appeal process following denial of benefits or termination of any claim.

c. <u>Changes in Claim Procedures</u>. The Company's claim procedures shall include the following ongoing objectives:

(i) Increased focus on policies and procedures relating to medical and related evidence, including        but not limited to the following:

- Obtaining complete medical records needed for the decision;
- Appropriate use and consideration of in-house medical resources;
- Contacting an Attending Physician ("AP") where circumstances warrant and fairly interpreting or applying information from the claimant's AP;
- Obtaining a field visit where circumstances warrant;
- Conducting an occupational review, as appropriate;
- Obtaining an Independent Medical Evaluation ("IME") or Functional Capacity Evaluation ("FCE") in appropriate circumstances and fairly interpreting or applying the IME or FCE , without any attempt to influence the impairment determinations of professionals conducting the IME and/or FCE;

(ii) Clear and express notice to claimants of the information to be provided by the claimants and        the information to be collected by the Company. If a file is determined to lack specific information,        Company personnel will work with claimant to obtain such information in accordance with                appropriate procedures established for such purposes.

No later than the Implementation Date, the Company shall implement changed claim procedures consistent with the foregoing objectives developed in consultation with the Lead Regulators and the DOL as described in Exhibits 4, 5, 6, and 7 hereto.

d. <u>Selection of Evaluation Personnel</u>. The Company shall select individuals to conduct IMEs or FCEs solely on the basis of objective, professional criteria, and without regard to results of previous IMEs or FCEs conducted by such individuals.

e. <u>Professional Certification</u>. Each clinical, vocational and medical professional employed by the Company must execute the "Statement Regarding Professional Conduct" found at Exhibit 5, which includes a commitment to provide fair and reasonable evaluations considering all available medical, clinical, and/or vocational evidence, both objective and subjective, bearing on impairment. In addition, for each determination as to a claimant's impairment(s), each clinical, vocational and medical

professional who makes a determination as to claimant impairments must certify that he or she has reviewed all medical, clinical and vocational evidence provided to that professional by Company personnel bearing on the impairment for which such professional is trained prior to making a determination as to such impairments.

f. Providing Medical, Clinical and/or Vocational Evidence. Claim personnel, in soliciting evaluations of claimant impairment by clinical, vocational and medical professionals (employed by the Company or otherwise), shall provide to such professionals all available medical, clinical and/or vocational evidence in the claim file, both objective and subjective, concerning impairment.

g. Claims involving co-morbid conditions. (i) When multiple conditions or co-morbid conditions are present, Company personnel will ensure that all diagnoses and impairments are considered and afforded appropriate weight in developing a coherent view of the claimant's medical condition, capacity and restrictions/limitations. (ii) No later than the Implementation Date, the Companies will implement improved procedures for evaluating claims which involve multiple or co-morbid conditions in accordance with Exhibit 4 hereto and subparagraph (i) above.

h. Training. No later than March 1, 2005, substantially all employees in the Company's claim operations shall be provided appropriate training designed to educate them on the responsibilities arising from the changes in claim procedures included in paragraph B.3 of this Agreement with emphasis on concerns raised in the Multistate Examination and the corrective measures set forth in the Plan. This training will include specific instruction on the following: (i) Company personnel should recognize the special function that medical professionals perform in assessing medical information concerning claimants and should not attempt to influence an in-house physician or an IME or FCE in connection with such professional's opinion concerning the medical evidence or medical condition relating to a claimant, and (ii) Company personnel in claim handling positions will be evaluated and will be eligible for incentive compensation only on the basis of the quality of performance in the position each holds, and the outcome of any claim decision or any number of claim decisions is not permitted as a part of this evaluation or award of incentive compensation. The Company hereby confirms that it shall not measure the performance of claim personnel or otherwise incentivize their performance, or deny or close specific claims based on claim denial or closure targets. Not later than March 1, 2005, all group policyholder human resources staff shall be offered appropriate training alternatives designed to help them support employee-claimants in making claims.

i. Monitoring of Compliance with Revised Claim Procedures. The Lead Regulators shall monitor compliance with the changes in claim procedures set forth in paragraphs B.3.b. through B.3.g. above and may conduct examinations of claims in the manner and at such intervals as the Lead Regulators deem appropriate. The DOL may monitor compliance with changes in claim procedures set forth in paragraphs B.3.b. through B.3.g above and may conduct examinations of claims in the manner and at such intervals as the DOL deems appropriate. The examinations of claims will include but not be limited to review of claim files for the following problems, including failure to:

- Conduct a field visit where circumstances warrant;
- Obtain complete medical records;
- Fairly interpret or apply information from the claimant's AP;
- Use appropriate in-house medical resources;
- Fairly interpret or apply in-house medical opinions;
- Contact AP where circumstances warrant;
- Conduct appropriate occupational review;
- Obtain an IME or FCE where circumstances warrant;
- Select individuals to conduct IMEs and FCEs solely on the basis of objective, professional criteria, and without regard to results of previous IMEs or FCEs;
- Fairly interpret or apply IME or FCE results;
- Appropriately classify disabilities under the mental and nervous limitation provisions of its policies; or
- Follow Company claim procedures or other Company procedures.

Claim files will also be examined for evidence of:

- Reliance on lack of "objective" data or "objective" medical information as a basis for claim denial or termination of benefits;
- Faulty or overly restrictive interpretation or application of policy provisions, including the definition of "occupation" in "own occupation" policies;
- Actions suggesting a pre-disposition or bias against the claimant;
- Threats to seek repayment of past benefits;
- Forcing claimants to seek legal counsel to obtain benefits; or
- Evidence of any incentives provided to deny or terminate benefits.

j. <u>Standard for Compliance</u>. The Company shall be deemed in compliance with the Handbook's maximum tolerance standard for claim procedures (presently 7%) unless the collective number of claim files with errors for the Company and its affiliated companies executing substantially similar agreements as of this date (the "Group") results in an error rate that exceeds such maximum tolerance standard. Such error rate(s) shall be determined by the Lead Regulators' review of separate statistically credible random samples of the total files for the Group's long term *group* and *individual* disability income insurance claims denied or benefits terminated on or after the Implementation Date, in accordance with paragraph B.3.i above. Separate Group error rates shall be determined for the Group's long term: (i) group disability income claims; and, (ii) individual disability income claims.

k. <u>Opportunity for Review and Comment</u>. The Companies shall be entitled to review and comment on any such examination results in accordance with the provisions of the Handbook.

l. <u>Claim Files</u>. A claim file shall include all documents relating to a claim history and/or decision, including but not limited to correspondence, medical records, vocational records, forms, internal memoranda and internal communications (including e-mail communications), which shall be maintained in the claim file either in a paper file, or in

electronic form in the case of the Companies' offices which operate in a "paperless" environment. The Lead Regulators and the DOL shall have access to all such paper or electronic files at all times. All claims reassessments pursuant to Paragraph B.2. and all new claim reviews pursuant to Paragraph B.3. shall be based upon a review of the entire claim file.

## C. Other Provisions

1. This Agreement shall be governed by and interpreted according to laws of the State of Maine, excluding its conflict of laws provisions, and any applicable federal laws.

2. It is expected that the Lead Regulators, on behalf of and for the benefit of the Participating Regulators, will monitor the Company's compliance with this Agreement and any Consent Order to which it is attached. The DOL may also monitor the Company's compliance with this Agreement and any consent Order to which it is attached. It is further expected that the Lead Regulators, on behalf of and for the benefit of the Participating Regulators, will conduct a full re-examination of the issues addressed by the Multistate Examination within twenty-four months after the Implementation Date and make all reasonable efforts to complete such re-examination within six months of its commencement. The DOL also reserves the right to conduct further investigation as it deems appropriate.

3. The reasonable costs of the Lead Regulators in monitoring the Company's compliance with this Agreement, including the cost of conducting any reviews or examinations provided for by the Agreement, shall be paid by the Company.

4. This Agreement is being made in conjunction with the entry of related Consent Orders arising from the Multistate Examination, and it shall be implemented and administered harmoniously with those Consent Orders.

5. a. The Lead Regulator shall deliver this Agreement to each of the Participating States within five (5) days following its execution by the Company, the DOL and the Lead Regulator.

b. Each person signing on behalf of a Participating State gives his/her express assurance that under applicable state laws, regulations and judicial rulings, that the person has the authority to enter into this Agreement on behalf of the Participating State.

c. Each Participating Regulator shall execute and deliver this Agreement to the Lead Regulator within thirty (30) days following the receipt of this Agreement from the Lead Regulator. If a Participating Regulator finds that, under applicable state law, regulation or procedure, the preparation and execution of a consent order is necessary to carry out the terms of this Agreement, such a consent order (the "Applicable Consent Order") shall be prepared by such Participating Regulator within thirty (30) days following the receipt of this Agreement from the Lead Regulator. The Lead Regulators

may waive the thirty (30) day period for Participating Regulators to execute this Agreement.

     d. For purposes of this Agreement, an "Applicable Consent Order" shall be satisfactory to the Company if it: (i) incorporates by reference and attaches via exhibit a copy of this Agreement, (ii) expressly adopts and agrees to the provisions of this Agreement, and (iii) includes only those other terms that may be legally required in the state of the applicable Participating Regulator. However, nothing in this Agreement shall be construed to require any state to execute and deliver an Applicable Consent Order if such state elects instead to sign this Agreement.

     6. Within ninety (90) days of the Implementation Date, the Company will send a letter to the Plan Administrator of each ERISA-covered plan as to which any of the Companies provided group long term disability insurance coverage between January 1, 1997 and December 31, 1999, indicating that the Agreement is available on the Parent Company's website and making particular reference to Section B.2.b.

     7. Time is of the essence in implementing the provisions of this Agreement, and the times specified may only be extended for good cause and with the advance written consent of the Lead Regulators, but such consent of the Lead Regulators shall not be unreasonably withheld.

     8. A decision by the Lead Regulator in this Agreement means a decision that has been agreed to by all three of the Lead Regulators under this Agreement and substantially identical agreements referred to in the Recitals.

     9. This Agreement shall remain in effect until the later of (i) January 1, 2007; (ii) the substantial completion of review by the Claim Reassessment Unit of claims for which review has been requested by Specified Claimants and Requesting Claimants and information needed for the review has been submitted on a timely basis; or (iii) the completion of the full re-examination referenced in paragraph C.2. Except as set forth in paragraph C.10 below, this Agreement and its provisions terminate for all purposes pursuant to this paragraph C.9.

     10. Notwithstanding the termination of this Agreement to the extent provided in accordance with paragraph C.9 above:

     (i) This Agreement shall survive as to the following provisions, which also individually survive: paragraphs -- B.2.b.3 (insofar as it relates to the consideration to be given Social Security disability awards); B.3.a (insofar as it establishes objectives for the Company's claim organization); B.3.b; B.3.c. (insofar as it establishes objectives for the Company's claim procedures); B.3.d; B.3.e; B.3.f; B.3.g. (insofar as it establishes objectives regarding evaluation of claims with co-morbid conditions); B.3.h (insofar as it confirms that claim personnel performance shall not be measured based on claim denial or termination targets or that claims will be closed based on termination or denial targets); B.3.l (insofar as it describes the content of a claim file).

(ii) The foregoing surviving obligations of the Company may only be amended by obtaining the consent of the Lead Regulators (acting in accordance with paragraph C.8), two-thirds of the Participating Regulators and the DOL, to any such amended provision: and,

(iii) Following termination of this Agreement for purposes of paragraph C.9 above, the Company will not materially change the claim procedures described in Exhibits 4, 5, 6 and 7 hereto unless (1) it first notifies the Lead Regulators and the DOL thirty days in advance of the proposed change and (2) the Lead Regulators and the DOL, within ten days of receipt of such notice, do not reasonably object.

11. Neither this Agreement nor any related negotiations, statements or court proceedings shall be offered by the Company, the Lead Regulator, the DOL or the Participating Regulators as evidence of or an admission, denial or concession of any liability or wrongdoing whatsoever on the part of any person or entity, including but not limited to the Company, the Companies or the Parent Company, or as a waiver by the Company, the Companies or the Parent Company of any applicable defense, including without limitation any applicable statute of limitations or statute of frauds, except as set forth in B.2.d. of this Agreement.

12. The Company does not admit, deny or concede any actual or potential fault, wrongdoing or liability in connection with any facts or claims that have been or could have been alleged against it, but considers it desirable for this matter to be resolved because this Agreement will provide substantial benefits to the Company's present and former policyholders and insureds.

13. Neither this Agreement nor any of the relief to be offered under this Agreement shall be interpreted to alter in any way the contractual terms of any policy, or to constitute a novation of any policy. Neither this Agreement nor any relief to be offered under this Agreement shall be interpreted to reduce or increase any rights of participants in ERISA-covered plans, including but not limited to rights to which they may be entitled pursuant to ERISA 29 U.S.C. 1133, and 29 C.F.R. 2560.503-1, including any appeal or review rights under the plan. Other than those rights afforded under this Agreement, no additional rights are provided to the extent that any Specified Claimants or Requesting Claimants have previously exercised their rights as mentioned in this paragraph 13 (or have failed to exercise their rights and therefore, as provided for under ERISA, have permitted those rights to lapse).

14. The effectiveness of this Agreement is conditioned upon the following: (i) approval and execution of the Agreement by the Company, the Lead Regulators and the DOL, (ii) approval and execution of the Agreement by appropriate documentation of no less than two-thirds of the Participating States unless a lesser number is agreed by the Company, (iii) approval and execution of substantially identical regulatory settlement agreements between each of the other two insurance companies that come within the definition of Companies and their respective domiciliary regulators, and (iv) the approval and execution of a substantially identical regulatory settlement agreement between the

New York subsidiary, the New York Superintendent of Insurance and the Lead Regulators.

15. During the pendency of this Agreement, each of the Participating Regulators agrees that such Participating Regulator and his or her insurance department (i) will not conduct a market conduct examination of the Companies relating to the Model Act, and (ii) will not impose a fine, injunction or any other remedy on any of the Companies for any of the matters that are the subject matter of this Agreement and may only participate on terms set forth in this Agreement in any fine or remedy that may be imposed under this Agreement . Notwithstanding the foregoing, upon notice from any Participating Regulator to the Lead Regulators, the Participating Regulator and the Lead Regulators shall proceed to investigate an assertion of the Company's non-compliance herewith regarding residents of said Participating Regulator's state.

16. This Agreement (or its Exhibits and their Attachments) may be amended by the Lead Regulators, the DOL and the Company without the consent of any Participating Regulator, provided that any such amendment does not materially alter this Agreement. Any amendment to the terms of the Agreement (or to its Exhibits and their Attachments) which would affect the regulatory authority of any Participating Regulators(s) shall not become effective without the consent of such Participating Regulator(s). All such amendments to this Agreement shall be in writing.

17. The DOL may enter into arrangements or agreements with any of the Lead Regulators or Participating Regulators pursuant to Section 506 of ERISA, 29 U.S.C. Section 1136, for cooperation, mutual assistance, or use by the DOL of facilities or services in connection with monitoring compliance with the Agreement and Title 1 of ERISA (including 29 C.F.R. Section 2560.503-1) and receiving reports on activities undertaken in connection with this Agreement. To the extent the Secretary enters into such an arrangement or agreement with any of the Lead Regulators or Participating Regulators, the Company shall provide reimbursement for any expenses incurred pursuant to C.3 of this Agreement.

18. For the duration of this Agreement, if any Lead Regulator or Participating Regulator finds any information which it believes constitutes a violation of ERISA with respect to any employee benefit plan, such regulator shall report that information to the DOL as soon as practicable.

**D. Remedies**

1. In the event that the Group fails to implement all of the changes in corporate governance provided for in paragraph B.1. of this Agreement within the times specified in that paragraph, the Group shall pay a fine of $100,000 per day until the failure of compliance is cured; provided, however, the Group will not be deemed to be non-compliant with the time requirements of paragraph B.1. if the Lead Regulators have not approved both of the candidates proposed by the Board of Directors to become new directors.

2. In the event that the Group fails to implement the Claim Reassessment Process provided for in paragraph B.2. of this Agreement within the times specified in that paragraph, the Group shall pay a fine of $100,000 per day until the failure of compliance is cured.

3. In the event that the Group fails to provide the initial notice to Specified Claimants within the period set forth in Exhibit 1, the Group shall pay a fine of $100,000 per day until the failure of compliance is cured.

4. In the event that the Group fails to implement the changes to the claim organization or the changes to the claim procedures provided for in paragraph B.3.a., paragraph B.3.c. or paragraph B.3.g. within the times specified therein, the Group shall pay a fine of $100,000 per day until the failure of compliance is cured.

5. In the event that the Group fails to conduct the training provided for in paragraph B.3.h. within the time specified therein, the Group shall pay a fine of $100,000 per day until the failure of compliance is cured.

6. Upon material completion of the Claim Reassessment Process, should the Lead Regulators upon examination determine that claim reassessment decisions were made in a manner inconsistent with the procedures of the Claim Reassessment Unit, the Group shall pay a fine of $145,000,000. The Group shall be deemed in compliance with the Handbook's maximum tolerance standard for claim procedures (presently 7%) unless the number of claim files with errors results in an error rate for either their collective subject *group* or *individual* claims hereunder that exceeds such maximum tolerance standard. Such error rates shall be determined by the Lead Regulators based on a review of statistically credible random separate samples of each of the *group* and *individual* claim reassessment decisions for the Group. A total fine of $145,000,000 shall be payable under this paragraph and/or paragraph D.7, but not both, in the event that the error rate exceeds the maximum tolerance standard for either or both of the *group* and/or *individual* claim samples. The Lead Regulators will use their best efforts to complete this determination by July 1, 2007.

7. Upon completion of the examination described in paragraph C.2, should the Lead Regulators determine that claims denied or benefits terminated after the Implementation Date did not meet the standard for compliance set forth in paragraph B.3.j, the Group shall pay a fine of $145,000,000. Such error rates shall be determined by the Lead Regulators based on review of a statistically credible random separate sample of each of the *group* and *individual* subject claims denied or benefits terminated after the Implementation Date. A total fine of $145,000,000 shall be payable under this paragraph and/or paragraph D.6, but not both, in the event that the number of claim files with errors results in an error rate that exceeds the maximum tolerance standard for either or both of the *group* and/or *individual* claim samples. The Lead Regulators will use their best efforts to complete this examination by July 1, 2007.

8. The purpose of any fines imposed pursuant to paragraphs D.1 through D.5 is to encourage timely implementation of the matter set forth in each paragraph.

9. Within fifteen (15) days of being advised in writing by the Lead Regulators that the required two-thirds of Participating States have approved and consented to this Agreement (unless the Company consents to a lower number) and the other conditions of effectiveness set forth in paragraph C.14 having been satisfied, the Group shall pay to the Lead Regulators a fine of $15,000,000.

10. In addition to the other penalties applicable pursuant to this Agreement, and notwithstanding the error rate threshold, the Lead Regulators and Participating Regulators retain the right to impose any regulatory penalty otherwise available by law, including fines, with respect to the Company's willful violation of the terms of this Agreement or other violation of law.

11. The obligation, as among the individual Company members of the Group, to pay any such fines shall be equal to the proportional capital and surplus of each Company to the Group's obligation, such calculation to be based on the most recently filed NAIC financial statement of each such Company.

12. All fines paid under the foregoing subparagraphs shall be paid to the Lead Regulators and then allocated among the Lead Regulators and all Participating Regulators on the basis of the Company's premium volume for in-force policies of individual and group disability insurance as of December 31, 2003.

13. The Lead Regulators, the DOL and the Participating Regulators reserve the right to pursue any other remedy or remedies for violations of this Agreement. Nothing in this Agreement shall be construed to waive or limit the rights of the Lead Regulators, the DOL and the Participating Regulators to seek such other and additional remedies.

14. The enforcement of any fine imposed hereunder and the findings upon which any such fine are based shall be subject to judicial review as otherwise provided by law.

UNUM LIFE INSURANCE COMPANY OF AMERICA

BY:_____

ITS:_____

November __, 2004

MAINE BUREAU OF INSURANCE          MASSACHUSETTS DIVISION OF
                                   INSURANCE

BY:_____

Alessandro A. Iuppa, Superintendent             BY:_____
                                                      Julianne M. Bowler,
                                                      Commissioner

November __, 2004                               November __, 2004

TENNESSEE DEPARTMENT OF COMMERCE
AND INSURANCE

BY:_____
      Paula A. Flowers, Commissioner

November __, 2004

ELAINE L. CHAO
SECRETARY OF LABOR

ANN L. COMBS
ASSISTANT SECRETARY
EMPLOYEE BENEFITS SECURITY ADMINISTRATION

BY:_____
      James M. Benages
      Regional Director
      Employee Benefits Security Administration

      November __, 2004

Post Office Address:

U.S. Department of Labor
Employee Benefits Security Administration
JFK Federal Building, Room 575
Boston, MA 02203
TEL:(617)565-9600
FAX:(617)565-9666

**PARTICIPATING REGULATOR ADOPTION**

On behalf of [Insert the State and Insurance Regulatory Agency], I, [Insert name of insurance regulatory official executing the Agreement], hereby adopt, agree and approve this Agreement.

[NAME OF INSURANCE REGULATORY AGENCY]

BY:_____
　　　[Title of Regulator]

　　　November __, 2004

<u>**EXHIBIT 1**</u>

<u>**CLAIM REASSESSMENT PROCESS, UNIT STRUCTURE
AND OPERATING PROCEDURES**</u>

Exhibit 1 is responsive to Paragraph B.2.a of the Regulatory Settlement Agreement

**I. Purpose**

In accordance with the Regulatory Settlement Agreements (the "Agreements") entered
into by Unum Life Insurance Company of America, The Paul Revere Life Insurance
Company, Provident Life and Accident Insurance Company, Provident Life and Casualty
Insurance Company, the Lead Regulators and Participating Regulators, and the U.S.
Department of Labor, and in accordance with a substantially identical regulatory
settlement agreements entered into by First Unum Life Insurance Company, the New
York Superintendent of Insurance, the Lead Regulators and the United States Department
of Labor, a Claim Reassessment Process (the "Reassessment Process") and a Claim
Reassessment Unit (the "CRU") have been established. This document describes the
Reassessment Process and the structure and operating procedures of the CRU. Unum Life
Insurance Company of America, The Paul Revere Life Insurance Company, Provident
Life and Accident Insurance Company, First Unum Life Insurance Company and
Provident Life and Casualty Insurance Company shall be referred to herein as "the
Companies".

**II. Reassessment Process**

a. **Specified Claimant**: "Specified Claimant" is defined in Paragraph B.2.b. of the
Agreements.
b. **Initial Notice to Specified Claimants**: Beginning earlier and ending no later than
the fifteenth business day following the Implementation Date under the
Agreements , the Companies will mail an Initial Notice to Specified Claimants
advising them that they may have their claim reassessed by the CRU. The Initial
Notice will be dated no earlier than the date that it is posted in the mail. Specified
Claimants electing to participate must respond to the Initial Notice within 60 days
of the date of the Initial Notice. The form of notices are set forth in Attachment
A-1 and Attachment A-2 to this Exhibit. With respect to any Specified Claimants
whose mailed notice is returned as undeliverable, the Company shall use
reasonable efforts to obtain a more recent address through appropriate means to
locate individuals including additional letter-forwarding services offered by the
United States Postal Service, the Internal Revenue Service and Social Security
Administration and the date for response shall be adjusted accordingly..

c. **Acknowledgement**: Specified Claimants who respond that they would like their claim reassessed (a "Confirmed Claimant") will have their response acknowledged in writing within 30 days of receipt of the response.

d. **Reassessment Information Form**: Prior to the date when the CRU will begin reassessing a Confirmed Claimant's claim, the Confirmed Claimant will be sent a letter stating the approximate time for review of his or her claim. The Confirmed Claimant will also receive a Reassessment Information Form requesting information to support the reassessment of the claim in question. All Reassessment Information Forms must be returned within 60 days of the date of cover letter to the Reassessment Information Form, which will also be a date that is no earlier than the date the letter is posted in the mail, in order to be considered by the CRU, unless the Confirmed Claimant requests in writing an extension and explains why such an extension is needed. The cover letter is set forth as Attachment B to this Exhibit and the Reassessment Information Form is set forth in Attachment C to this Exhibit.

e. **Acknowledgement**: Confirmed Claimants who return their Reassessment Information Forms will be sent an acknowledgement of the receipt of the completed form within 30 days of its receipt or a request for specific information needed to complete the form in order for the CRU to review the claim.

f. **Requesting Claimants**: "Requesting Claimants" means (i) those claimants whose claims were denied or terminated prior to January 1, 2000 and no earlier than January 1, 1997 and the claimant would otherwise be included within the definition of "Specified Claimant" except for the application of the January 1, 2000 date, and (ii) those claimants whose claims were denied or terminated on or after January 1, 1997 and prior to the Implementation Date who dispute the Companies' characterization on any rational basis that such denial or termination falls into any of the reasons outlined in (i) – (iv) of the definition of "Specified Claimant" and in both cases are entitled under Paragraph B.2.b. of the Agreements to request to have their claim reassessed. Claimants who come within the definition of Requesting Claimants must make a request to the Company within 180 days following the Implementation Date. Requesting Claimants who make a request within this time period will be provided a procedure that is essentially identical to that described in Paragraphs II. c. though II. e. above, and as otherwise generally described in this Exhibit 1 for Confirmed Claimants, except that the reassessment process for Requesting Claimants will begin after the reassessment of the Confirmed Claimants is substantially complete. The reassessment schedule for Requesting Claimants will begin with the oldest of the claims of the Requesting Claimants that were denied or terminated being reassessed first. Tracking data on Requesting Claimants will be kept separate from that of Confirmed Claimants.

**III. Claim Reassessment Unit**:

a. **Structure of CRU**: The CRU will operate as a unit of the Benefit Center and will report to the most senior executive in charge of claim operations. The CRU will be staffed with personnel who have experience with group and/or individual long

term disability claims handling. Other staff available to the CRU will include clinical consultants (nurses), physicians, vocational rehabilitation specialists and attorneys. The staffing of the CRU will be based on the number of individuals needed to review and investigate, within a two year period, all requests for reassessment submitted by Confirmed Claimants.

b. **Claim Review Schedule**: The CRU will review the claims of Confirmed Claimants based upon the date the claim was originally denied or terminated with the oldest claims being reviewed first.

c. **Standard of Review**: The CRU will apply a de novo standard of review using the claims handling procedures, including those provided for in the Regulatory Settlement Agreement which will have been implemented as of the date of any reassessment by the CRU.

d. **Investigation and Decision Process**: The CRU will gather any appropriate information not contained in the claim file or in information provided by the Confirmed Claimant including, but not limited to, medical, occupational and financial information. Medical analysis will involve utilizing internal and external resources as appropriate, including peer calls and independent medical examinations and will adhere to established protocols. Once a claim decision is determined, it will be reviewed by either the Manager of the CRU or a Quality Compliance Consultant, as appropriate, and communicated to the Confirmed Claimant.

e. **Reopened Claims**: Any claim that is reopened and will require additional claim handling will be referred to the appropriate unit of claims operations.

f. **Tracking and Reporting**: The CRU will electronically track information related to the Claim Reassessment Process. The information will include, but not be limited to:

i. Names of Specified Claimants and state of residence
ii. Date of Mailing Initial Notice to Specified Claimants
iii. Names of Confirmed Claimants
iv. Date Acknowledgement sent to Confirmed Claimants
v. Date Reassessment Information Form sent
vi. Date completed Reassessment Form is received.
vi. Beginning date for reassessment of each Confirmed Claimant's claim.
vii. Decision date for each reassessment.
viii. Outcomes of reassessment decisions.

Matters listed above that involve mailings to the claimant will be dated no earlier than the date in which they are posted in the mail. Reports will be provided to the Regulatory Compliance Unit and will be produced to reflect results on a state by state basis using the residence of the claimant as the basis of the state for which a claim is reported as well as on a group basis.

**IV. Monitoring of Claim Reassessment Process and CRU**

a.  The Regulatory Compliance Unit will request that internal audits of the CRU process and decision-making be conducted on a quarterly basis, and establish a schedule of internal audits, including the number of reassessed files and other subjects to be audited. These internal audits will be conducted by the internal audit unit under guidelines approved by the Senior Vice President of the Claims Operations. The results of those audits will be provided to the Regulatory Compliance Unit for reporting to the Regulatory Compliance Committee of the Parent Company's Board of Directors, the Lead Regulators and Senior Management of the Parent Company.

b.  **Lead Regulator Review**: Decisions by the CRU and its procedures are also subject to review by the Lead Regulators and the DOL as they deem appropriate.

## <u>EXHIBIT 1 -- ATTACHMENT A-1</u>

## <u>(GENERAL NOTICE TO CLAIMANTS ELIGIBLE FOR REASSESSMENT)</u>

[Date]

[Name]
[Address]
[Address]

Re: Claim No. _____

Dear [personalized]:

As part of a multistate settlement with insurance regulators and the United States Department of Labor (the "DOL"), The Paul Revere Life Insurance Company, Provident Life and Accident Insurance Company, Provident Life and Casualty Insurance Company, First UNUM Life Insurance Company and UNUM Life Insurance Company of America ("the Companies") have agreed to implement a Claim Reassessment Process, under which your long term disability claim as captioned above has been determined to be eligible. For that reason, if you believe that you may be eligible for benefits for which you have not been paid, you are entitled to request that the Companies review their previous decision to deny your disability income claim or terminate benefits being paid on such claim. The settlement with insurance regulators and the DOL sets forth the procedures under which the Companies will conduct the Claim Reassessment Process. This Process will be monitored by the insurance regulators and, as to claimants who are or were covered under an employee benefit plan, by the DOL. A copy of the Regulatory Settlement Agreement is available on the website of UnumProvident Corporation.

If you wish to elect to participate in the Claim Reassessment Process, you must do one of the following within 60 days of the date of this letter:

- Fill out and return the enclosed sheet in the envelope provided; OR
- Visit www.unumprovident.com/[TO BE DETERMINED] with your claim number ready (provided at the top of this page); OR
- Place a toll-free call to 800.xxx.xxxx and provide your name, current address and claim number. This phone number is provided for your convenience in making your election to participate, but no other information is available currently through this special temporary line.

Your decision to participate in the Claim Reassessment Process will be acknowledged by the Companies.

The Companies will review claims of those electing to participate based on the

original dates of when the claim was denied or closed with the oldest closure dates being reviewed first. The Companies will send you a second notice at a time that is closer to the period when your claim will be reviewed indicating the approximate time period of that review and requesting that you complete and return a Reassessment Information Form to provide information needed for the review of your claim.

Once you have completed and returned your Reassessment Information Form, the Companies will acknowledge its receipt and indicate any specific information that is still needed in order for the Companies to reassess your claim. Once our prior claim decision has been reassessed and any additional investigation is completed, the Companies will advise you in writing whether your claim will be re-opened and further benefits paid.

You are under no obligation to participate in the Claim Reassessment Process. Should you decide not to participate you will not lose any rights that you otherwise have. However, should you choose to participate, you will need to agree that if (and only if) the reassessment results in a reversal or other change in our prior decision denying or terminating benefits, you will not pursue legal action against the Companies to the extent (and only to the extent) such action would be based on any aspect of the prior denial or termination that is reversed or changed.

If you have already commenced legal action relating to your prior claim(s) decision, please provide a copy of this letter to your attorney as soon as possible so that he or she might advise you concerning the alternatives. If, after consulting with your attorney, you decide to participate in the reassessment, you will need to agree to take such action as is necessary to seek to stay such litigation pending the outcome of the reassessment process. If the court does not agree to a stay and a final verdict or judgement is entered prior to completion of the reassessment, the Company will have no further obligation to reassess your claim. If the court stays the litigation relating to your claim, you will need to agree that if (and only if) the reassessment results in a reversal or other change in the prior decision denying or terminating benefits, you will withdraw and dismiss with prejudice your litigated claim, including extracontractual claims, to the extent (and only to the extent) such claims are based on any aspect of the prior denial or termination that is reversed or changed. In other words, to the extent that following the reassessment there remains a complete or partial denial of benefits, a claimant's right to initiate or continue litigation regarding that portion of the prior denial that has not been reversed or changed shall not be waived. As to any portion of a prior denial that is reversed or changed and you have agreed to withdraw the action as described above, the Company will attempt to reach agreement with you regarding the payment of any reasonable attorney's fee to which you may be entitled under law, and if we are unable to reach such an agreement, you will not be prejudiced from pursuing such fees in a court of law. After you have discussed this with your attorney, we encourage your attorney to contact the attorney representing the Company to discuss these matters so that you might make an informed decision regarding participation in the reassessment process and your other alternatives.

These agreements relating to commencing legal action and any pending litigation, which will be included with the Reassessment Information Form for you to sign, will not apply to the extent that our prior decision denying or terminating benefits is not reversed as a result of the Claim Reassessment Process and any applicable statute of limitations will be tolled during the pendency of the reassessment process..

Sincerely,


[Name]
[Title]

**EXHIBIT 1 -- ATTACHMENT A-2**

**(NOTICE TO CLAIMANTS W/CLAIM CLOSURE CODED AS RTW)**

[Date]

[Name]
[Address]
[Address]

Re: Claim No. _____

Dear [personalized]:

As part of a multistate settlement with insurance regulators and the United States Department of Labor (the "DOL"), The Paul Revere Life Insurance Company, Provident Life and Accident Insurance Company, Provident Life and Casualty Insurance Company, First UNUM Life Insurance Company and UNUM Life Insurance Company of America ("the Companies") have agreed to implement a Claim Reassessment Process, under which your long term disability claim as captioned above _may_ be eligible.

Our records show you returned to work and that places you in a special category relating to eligibility for the Claim Reassessment Process. If you believe your claim was _inappropriately denied or terminated_ you may be eligible for benefits for which you have not been paid and are entitled to request that the Companies review their previous decision to close your claim. The settlement with insurance regulators and the DOL sets forth the procedures under which the Companies will conduct the Claim Reassessment Process. This Process will be monitored by the insurance regulators and, as to claimants who are or were covered under an employee benefit plan, by the DOL. A copy of the Regulatory Settlement Agreement is available on the website of UnumProvident Corporation.

If you wish to elect to participate in the Claim Reassessment Process, you must do one of the following within 60 days of the date of this letter:

- Fill out and return the enclosed sheet in the envelope provided; OR
- Visit www.unumprovident.com/[TO BE DETERMINED] with your claim number ready (provided at the top of this page); OR
- Place a toll-free call to 800.xxx.xxxx and provide your name, current address and claim number. This phone number is provided for your convenience in making your election to participate, but no other information is available currently through this special temporary line.

Your decision to participate in the Claim Reassessment Process will be acknowledged by the Companies.

The Companies will review claims of those electing to participate based on the original dates of when the claim was denied or closed with the oldest closure dates being reviewed first. The Companies will send you a second notice at a time that is closer to the period when your claim will be reviewed indicating the approximate time period of that review and requesting that you complete and return a Reassessment Information Form to provide information needed for the review of your claim.

Once you have completed and returned your Reassessment Information Form, the Companies will acknowledge its receipt and indicate any specific information that is still needed in order for the Companies to reassess your claim. Once our prior claim decision has been reassessed and any additional investigation is completed, the Companies will advise you in writing whether your claim will be re-opened and further benefits paid.

You are under no obligation to participate in the Claim Reassessment Process. Should you decide not to participate you will not lose any rights that you otherwise have. However, should you choose to participate, you will need to agree that if (and only if) the reassessment results in a reversal or other change in our prior decision denying or terminating benefits, you will not pursue legal action against the Companies to the extent (and only to the extent) such action would be based on any aspect of the prior denial or termination that is reversed or changed.

If you have already commenced legal action relating to your prior claim(s) decision, please provide a copy of this letter to your attorney as soon as possible so that he or she might advise you concerning the alternatives. If, after consulting with your attorney, you decide to participate in the reassessment, you will need to agree to take such action as is necessary to seek to stay such litigation pending the outcome of the reassessment process. If the court does not agree to a stay and a final verdict or judgement is entered prior to completion of the reassessment, the Company will have no further obligation to reassess your claim. If the court stays the litigation relating to your claim, you will need to agree that if (and only if) the reassessment results in a reversal or other change in the prior decision denying or terminating benefits, you will withdraw and dismiss with prejudice your litigated claim, including extracontractual claims, to the extent (and only to the extent) such claims are based on any aspect of the prior denial or termination that is reversed or changed. In other words, to the extent that following the reassessment there remains a complete or partial denial of benefits, a claimant's right to initiate or continue litigation regarding that portion of the prior denial that has not been reversed or changed shall not be waived. As to any portion of a prior denial that is reversed or changed and you have agreed to withdraw the action as described above, the Company will attempt to reach agreement with you regarding the payment of any reasonable attorney's fee to which you may be entitled under law, and if we are unable to reach such an agreement, you will not be prejudiced from pursuing such fees in a court of law. After you have discussed this with your attorney, we encourage your attorney to contact the attorney representing the Company to discuss these matters so that you might make an informed decision regarding participation in the reassessment process and your other alternatives.

These agreements relating to commencing legal action and any pending litigation, which will be included with the Reassessment Information Form for you to sign, will not apply to the extent that our prior decision denying or terminating benefits is not reversed as a result of the Claim Reassessment Process and any applicable statute of limitations will be tolled during the pendency of the reassessment process..

Sincerely,


[Name]
[Title]

## ATTACHMENT B

[Date]

[Name]
[Address]
[Address]

Re: Claim No. _____

Dear [personalized]:

You previously elected to participate in our Claim Reassessment Process with respect to the captioned claim. As we previously indicated, we are proceeding with the reassessment of claims based on their original dates of denial or closure. We are now ready to begin the reassessment of your claim, and appreciate your patience.

Our records indicate that your claim was closed or terminated on _____. We ask for your assistance in ensuring that your claim file is updated beyond that date, including your work history, medical information and details of other income or earnings you have received. Please use the attached Reassessment Information Form to provide this information. Also, please include any additional information you feel would be helpful to assist us in reassessing your claim.

The instructions on the Reassessment Information Form explain where to send your completed form. You will need to complete and return your Reassessment Information Form within 60 days of the date of this letter, which is no earlier than the date we will post it in the mail. We will send you an acknowledgement notifying you that we have received your completed Reassessment Information Form within 30 days of its receipt. If you need additional time to complete the Reassessment Information Form, please provide your reasons for needing an extension of time in writing to us within 60 days of the date of this letter.

Prior to reassessment of your claim, you must sign the Reassessment Information Form in each of the indicated places. This will confirm your agreement that if (and only if) the reassessment results in a reversal or other change in our prior decision denying or terminating benefits, that you will not pursue legal action against the Company to the extent (and only to the extent) such action would be based on any aspect of the prior denial or termination that is reversed or changed. It will also confirm your agreement that if you have already commenced legal action relating to your prior claim(s) decision, you will seek to stay such litigation pending completion of the reassessment of your claim, and your further agreement that if (and only if) the reassessment results in a reversal or other change in the prior decision denying or terminating benefits, then you will withdraw any litigated claim, including extracontractual claims to the extent, (and only to the extent) such claim is based on any aspect of the prior denial or termination that is

reversed or changed. In other words, to the extent that following the reassessment there remains a complete or partial denial of benefits, a claimant's right to initiate or continue litigation regarding that portion of the prior denial that has not been reversed or changed shall not be waived.

If we do not receive your completed Reassessment Information Form or request for extension within the timeframe noted above, we will assume that you no longer wish to participate in the Claim Reassessment Process and your claim will remain closed.

Once we have received your Reassessment Information Form and any other information we need to review, the reassessment of your claim could take from four to twelve weeks, depending on the complexity of your particular situation. We will contact you regarding any additional information that we may need. While your claim will be given a thorough review, please understand that participation in the Claim Reassessment Process does not necessarily mean that you will receive benefits or that a different decision will be reached.

If you have any questions regarding your claim and the Claim Reassessment Process, please feel free to call (1-800-___-____). Thank you very much for your cooperation.


Sincerely,



# Reassessment Information Form

**Mail to:** UnumProvident Claim Reassessment Unit
PO Box xxx, Portland, ME 04104-5028

**Claim Questions:** 1-866-xxx-xxxx

**Fax to:** 1-866-xxx-xxxx

___*REASSESSMENT INFORMATION FORM*___                **Attachment C**

Instructions: Please follow the instructions below for each section.  The information you provide will assist us in reassessing your claim.  If your condition prevents your being able to provide certain information requested, please call 1-866-xxx-xxxx for assistance.

   A.  Claimant Statement: Provide an update of certain personal information as indicated in this section.

   B.  Employment Statement:  Provide details regarding any work activity from the date your claim was closed through the present.  Depending on the terms of your policy, to qualify for benefits you may need to demonstrate a loss of functional duties and/or a loss in income.  In order to properly assess your claim we will need to have information regarding all work you have performed.  If you are claiming a loss in income while working, provide all supporting documentation available including tax returns and related IRS Forms W-2 and/or 1099; otherwise, this financial information is not needed to reassess your claim.

   C.  Medical Information Details: Provide all details regarding medical treatment received since your claim was closed.  This enables us to obtain any additional medical information we may need from your medical treatment providers.  To assist us in the Claim Reassessment Process, enclose any medical records or information you may have in your possession.  Medical information after the date your claim was closed is necessary to the extent you are claiming disability beyond the date when your claim was closed.

   D.  Other Income Benefits:  Provide us with details concerning any other income benefits you may have received or are receiving.  Please complete this section of the form and attach any supporting information you may have, including benefit awards, summaries etc.

   *You must sign and date each of the following sections of the form in order for us to begin the Claim Reassessment Process.*

   E.  Certification: Sign and date this form.

   F.  Conditional Waiver and Release: Sign and date this form.

   G.  Authorization: Sign and date this form.

Also please enclose any additional information that you feel will assist us in reassessing your claim.

The completed form should be sent to:

                 UnumProvident
                 Claim Reassessment Unit
                 PO Box XXXX
                 Portland, Maine 04104-5028



# Reassessment Information Form

**Mail to**:  UnumProvident Claim Reassessment Unit
       PO Box xxx, Portland, ME 04104-5028

**Claim Questions:**  1-866-xxx-xxxx

**Fax to:** 1-866-xxx-xxxx

**A. CLAIMANT'S PERSONAL INFORMATION** (PLEASE PRINT)

| Claimant's Name (as printed on your Social Security Card) | Home Telephone Number Including Area Code | Date of Birth | Social Security Number _____-____-_____ |
|---|---|---|---|
| | | ☐ Male ☐ Female | |
| Home Address (Street, City, State, Zip) | | | |
| Policy Number: | Claim Number: | | |
| Preferred e-mail address where you can be reached | | | |



# Reassessment Information Form

**Mail to**:  UnumProvident Claim Reassessment Unit
  PO Box xxx, Portland, ME 04104-5028

**Claim Questions:**  1-866-xxx-xxxx

**Fax to:** 1-866-xxx-xxxx

---

Explain why you believe that our previous decision to deny or terminate your claim was incorrect.



# Reassessment Information Form

**Mail to**:  UnumProvident Claim Reassessment Unit
PO Box xxx, Portland, ME 04104-5028

**Claim Questions:**  1-866-xxx-xxxx

**Fax to:** 1-866-xxx-xxxx

### B. CLAIMANT'S EMPLOYMENT INFORMATION (PLEASE PRINT)

| **Name of Employer A.** | Employer's Telephone Number |
|---|---|
| Dates of Employment | |
| Employer's Address (Street, City, State, Zip) | |
| Your occupation and work schedule with this employer | |
| Weekly or Monthly Earned Income Before Taxes $        (please provide documentation of earnings) | |

| **Name of Employer B.** | Employer's Telephone Number |
|---|---|
| Dates of Employment | |
| Employer's Address (Street, City, State, Zip) | |
| Your occupation and work schedule with this employer | |
| Weekly or Monthly Earned Income Before Taxes $        (please provide documentation of earnings) | |

| **Name of Employer C.** | Employer's Telephone Number |
|---|---|
| Dates of Employment | |
| Employer's Address (Street, City, State, Zip) | |
| Your occupation and work schedule with this employer | |
| Weekly or Monthly Earned Income Before Taxes $        (please provide documentation of earnings) | |



# Reassessment Information Form

**Mail to**: UnumProvident Claim Reassessment Unit
PO Box xxx, Portland, ME 04104-5028

**Claim Questions:**  1-866-xxx-xxxx

**Fax to:** 1-866-xxx-xxxx

---

### C. CLAIMANT'S MEDICAL INFORMATION (PLEASE PRINT)

Please provide full and complete responses, indicating "none" where applicable.  If more space is needed, please attach lists as necessary.

1. Name(s) and complete address(es) of any medical care provider you consulted for any condition since your claim was closed.

Name of Doctor        Complete Address (Street, City, State, Zip)        Dates of Treatment        Telephone/Fax#

2. Indicate the name(s) and complete addresses of any hospital/clinic where you received medical treatment, consultation, care or services (including diagnostic measures) since your claim was closed.

Name of Hospital/Clinic                Complete Address (Street, City, State, Zip)        Dates Treated
Telephone/Fax#

3. List any medications and prescribed drugs taken since your claim was closed.

Name of drug or medicine        Prescription Number        Pharmacy        Date        Physician

4. Please provide the complete address of any pharmacy listed in response to Question#3.

Name of Pharmacy        Complete Address(Street, City, State, Zip)                Telephone/Fax #



# Reassessment Information Form

**Mail to**:  UnumProvident Claim Reassessment Unit
            PO Box xxx, Portland, ME 04104-5028

**Claim Questions:**  1-866-xxx-xxxx

**Fax to:** 1-866-xxx-xxxx

---

**D. CLAIMANT'S OTHER INCOME BENEFITS** (PLEASE PRINT)

Check the other income benefits you have received, or are receiving, or are eligible to receive as a result of your disability and complete the information requested.

Please also report any changes to previously reported benefits.
**If you have been approved or denied for any of these benefits, please send a copy of award or denial notification.**

| Social Security/Retirement<br><br>☐ Yes  ☐ No | Social Security/Disability<br><br>☐ Yes  ☐ No | Canada Pension Plan<br><br>☐ Yes  ☐ No | State Disability<br><br>☐ Yes  ☐ No |
|---|---|---|---|
| Workers' Compensation<br><br>☐ Yes  ☐ No | Pension/Retirement<br><br>☐ Yes  ☐ No | Pension/Disability<br><br>☐ Yes  ☐ No | Unemployment<br><br>☐ Yes  ☐ No |
| No-fault insurance<br><br>☐ Yes  ☐ No | Short Term Disability        ☐ Yes  ☐ No – Ins. Co. Name and Policy # | | |
| Other (include Individual Disability or Group Disability Benefits)        ☐ Yes  ☐ No – Ins. Co. Name and Policy # | | | |



# Reassessment Information Form

**Mail to**:  UnumProvident Claim Reassessment Unit
             PO Box xxx, Portland, ME 04104-5028

**Claim Questions:**  1-866-xxx-xxxx

**Fax to:** 1-866-xxx-xxxx

### Claim Fraud Warning Statements

For your protection, the laws of several states, including Alaska, Arkansas, Delaware, Idaho, Indiana, Kentucky, Louisiana, Minnesota, New Hampshire, Ohio, Oklahoma, and others require the following statement to appear:

#### Fraud Warning

Any person who knowingly, and with intent to injure, defraud, or deceive an insurance company, files a statement of claim containing any false, incomplete, or misleading information is guilty of insurance fraud which is a felony.

#### Fraud Warning for California Residents

For your protection, California law requires the following to appear:

Any person who knowingly presents a false or fraudulent claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

#### Fraud Warning for Colorado Residents

It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company,. Penalties may include imprisonment, fines, denial  of insurance, and civil damages.  Any insurance company or agent of an insurance company who knowingly provides false, incomplete , or misleading facts or information to a policyholder or claimant for the purpose of defrauding or attempting to defraud the policyholder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

#### Fraud Warning for District of Columbia, Maine, Tennessee and Virginia Residents

It is a crime to knowingly provide false, incomplete or misleading information to an insurance company for the purposes of defrauding the company.  Penalties may include imprisonment, fines or denial of insurance benefits.

#### Fraud Warning for Florida Residents

Any person who knowingly and with intent to injure, defraud, or deceive any insurance company, files a statement of claim or an application containing false, incomplete or misleading information is guilty of fraud in the third degree.

#### Fraud Statement for New Jersey, New Mexico, and Pennsylvania Residents

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

#### Fraud Statement for New York Residents

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

E.   The information which I have provided on this Reassessment Information Form is true and complete to the best of my knowledge and belief.

Signature _____     Date_____



# Reassessment Information Form

**Mail to**:  UnumProvident Claim Reassessment Unit
              PO Box xxx, Portland, ME 04104-5028

**Claim Questions:**  1-866-xxx-xxxx

**Fax to:** 1-866-xxx-xxxx

F.   **Conditional Waiver and Release**

By choosing to participate in the Claim Reassessment Process, I hereby agree that if (and only if) the reassessment results in a reversal or other change in the prior decision denying or terminating benefits, I will not pursue any legal action to the extent (and only to the extent) such action is based on any aspect of the prior denial or termination that is reversed or changed.  If I receive any additional benefits as a result of this reassessment, I hereby waive and release any right to sue UnumProvident Corporation, its insurance subsidiaries* and duly authorized representatives, for their prior failure to pay those same benefits to me. If I have already commenced legal action relating to my prior claim(s) decision, I will take such action as is necessary to stay such litigation pending the reassessment process, if the court will agree to such a stay, and I agree that if (and only if) the reassessment results in a reversal or other change in the prior decision denying or terminating benefits, then I will withdraw any litigated claim, including any extra-contractual claims, to the extent (and only to the extent) such claims are based on any aspect of the prior denial or termination that is reversed or changed.  To the extent that following the reassessment there remains a complete or partial denial of benefits, my right to initiate or continue litigation regarding that portion of the prior denial that has not been reversed or changed is not waived.  In addition, any applicable statute of limitations is tolled during the pendency of the reassessment of my claim; however, I understand that my participation in the Claim Reassessment Process will not revive or reinitiate the statute of limitations with respect to the previous claim decision.


This waiver and release will not apply to the extent that any prior decision is not reversed as a result of the Claim Reassessment Process.


Signature _____   Date_____


* This waiver and release is valid for the following UnumProvident subsidiaries: Unum Life Insurance Company of America, First Unum Life Insurance Company, Provident Life and Accident Insurance Company, Provident Life and Casualty Insurance Company, The Paul Revere Life Insurance Company.



# Reassessment Information Form

**Mail to**:  UnumProvident Claim Reassessment Unit
PO Box xxx, Portland, ME 04104-5028

**Claim Questions:**  1-866-xxx-xxxx

**Fax to:** 1-866-xxx-xxxx

G.      NOTE: Federal law requires that we obtain this authorization from you.  You are not required to sign the authorization, but if you do not, UnumProvident may not be able to evaluate or administer your claim(s). Please sign and return this authorization with the completed Reassessment Information Form.

Authorization

I authorize any health care provider including, but not limited to, any health care professional, hospital, clinic, laboratory, pharmacy or other medically related facility or service; health plan; rehabilitation professional; vocational evaluator; insurance company; reinsurer; insurance service provider; third party administrator; producer; the Medical Information Bureau; the Association of Life Insurance Companies, which operates the Health Claims Index and the Disability Income Record System; government organization; and employer that has information about my health, financial or credit history, earnings, employment history, or other insurance claims and benefits to disclose any and all of this information to persons who administer claims for UnumProvident Corporation, its insurance subsidiaries* and duly authorized representatives ("UnumProvident"). Information about my health may relate to any disorder of the immune system including but not limited to, HIV and AIDS; use of drugs and alcohol; and mental and physical history, condition, advice or treatment, but does not include psychotherapy notes.  I understand that information on financial or credit history or earnings will not be sought from an employer if it is not relevant to evaluating my claim(s) for benefits.

I understand that any information UnumProvident obtains pursuant to this authorization will be used for evaluating and administering my claim(s) for benefits, which may include assisting me in returning to work.  I further understand that the information is subject to redisclosure and might not be protected by certain federal regulations governing the privacy of health information.

This authorization is valid for two (2) years from the date below, or the duration of my claim, whichever period is shorter.  A photographic or electronic copy of this authorization is valid as the original.  I understand I am entitled to receive a copy of this authorization.

I may revoke this authorization in writing at any time except to the extent UnumProvident has relied on the authorization prior to notice of revocation or has a legal right to contest a claim under the policy or the policy itself.  I understand if I revoke this authorization, UnumProvident may not be able to evaluate or administer my claim(s) and this may be the basis for denying my claim(s).  I may revoke this authorization by sending written notice to the Company.

I understand if I do not sign this authorization or if I alter its content in any way, UnumProvident may not be able to evaluate or administer my claims(s) and this may be the basis for denying my claim(s).


Signature _____        Date_____

Print Name _____        Social Security Number _____

If signed on behalf of the claimant as personal representative, please indicate relationship here
_____.  If signed on behalf of the claimant as designee under power of attorney, as guardian, or as conservator, please attach a copy of the document granting authority.

*      This authorization is valid for the following UnumProvident subsidiaries: Unum Life Insurance Company of America, First Unum Life Insurance Company, Provident Life and Accident Insurance Company, Provident Life and Casualty Insurance Company, The Paul Revere Life Insurance Company.

## EXHIBIT 2

## CHANGES IN CLAIM ORGANIZATION

Exhibit 2 is responsive to Paragraph B.3.a. of the Regulatory Settlement Agreement.

### Current Organization

In the current organization of the Companies' claims operation the primary responsibility for making a claim decision rests with a Disability Benefit Specialist ("DBS") who generally receives guidance on a given claim from a Consultant who has more claim handling experience. The DBS also has access to additional internal resources, including nurses, physicians, vocational rehabilitation specialists, accountants and lawyers. The DBS's are in units that report to Managers and Directors, who have more claims handling experience but generally perform management roles and are not involved in individual claim files. Consultants generally do not have management responsibilities.

### Changes in Claim Organization

In order to address areas of concern noted in the Multistate Examination Report and increase the effectiveness of the claims operation in processing claims, changes are being made to increase the claim handling experience of personnel involved at the earliest stage of reviewing a claim, add to the accountability for compliance and increase the involvement of higher level management in approving claim decisions. The primary changes are as follows:

1) The Consultant position is being eliminated, and the individuals serving in that position are being reassigned to various other positions, including DBS, Manager, newly created positions in the Claim Reassessment Unit, and the newly created Quality Compliance Consultant positions.

2) Individuals serving in the existing Manager positions will become more directly involved in daily activities and decisions associated with claims; will be directly accountable for claim decisions made in their unit; will ensure that appropriate actions are taken and information received on claims before a decision is made; and will be responsible for developing the technical expertise of the staff in their unit. Managers generally have at least five years of claim handling experience.

3) A new position, Quality Compliance Consultant ("QCC") will be created to focus upon compliance, documentation, accountability for compliance, issues of fairness to claimants, and avoidance of improper claim practices. The position description for QCC is set forth in Exhibit 3.

<u>**EXHIBIT 3**</u>

Position Title: **Quality Compliance Consultant**
Job Code: New role to organization
Job Level:
Exemption Status: Exempt

**General Summary**

This highest level technical position is directly responsible for ensuring quality (appropriate file documentation and decision rationale) and compliance. They are relied upon to provide guidance, training and direction to the Disability Benefits team with a strong partnership with Legal.

**Principal Duties and Responsibilities**

**Claim Management**

- Enhance organizational performance through ensuring quality of claim documentation and decision rationale
- Develop and build in-depth technical expertise in the Disability Benefits team
- Analyze and conduct needs assessment to assist with development of strategies to improve quality of performance
- Utilize and convey expertise in multiple product lines (STD, LTD, IDI)
- Mentor claims personnel
- Utilize appropriate resources, as needed, to arrive at thorough, fair and objective decisions
- Proactively review files to assess quality and compliance
- Ensure corporate and claimant compliance with ERISA standards, as applicable

**Customer Service and Partnering**

- Provide feedback to Disability Benefits Specialists, Managers, and Directors on quality of specific claim documentation and decision rationale
- Build and maintain partnerships with management team members and legal team
- Partner with Legal to provide quantitative and qualitative feedback on overall quality of claim documentation and decision rationale
- Partner with QPS (Appeals, Audit and Training) to identify trends and develop action plans to improve overall quality of claim management
- May perform other duties as assigned

**Job Specifications**

- Any combination of education or experience equivalent to ten years disability experience and/or seven years disability claims experience preferred

- Demonstrated success in managing highly complex claims
- Undergraduate degree required
- Strong preference for one or more Insurance Industry designations (ALHC, FLMI, ACS, etc.)
- Proven ability to successfully coach and mentor others
- Strong decision making and problem solving skills
- Ability to effectively and professionally interact/partner with internal and external representatives and resources
- Exceptional written and oral communications
- Superior analytical skills with an understanding of the functional requirements of the organization
- Demonstrated understanding of disability claim operations

## EXHIBIT 4

## IMPROVED PROCEDURES FOR EVALUATING MULTIPLE CONDITIONS OR CO-MORBID CONDITIONS

### 1. Guiding Principles (see also UnumProvident Clinical, Vocational, and Medical Services Statement Regarding Professional Conduct)

Benefit Center professionals will evaluate all data available regarding a claim
     Both objective and subjective
     Both supporting impairment and supporting capacity


Benefit Center professionals will consider and afford appropriate weight to all diagnoses and impairments, and their combined effect on the whole person, when evaluating medical data in a claim file.

Where multiple conditions or co-morbid conditions are present, each medical professional and all other Benefit Center professionals evaluating the claim share responsibility to ensure that all diagnoses and impairments are considered and afforded appropriate weight.

When multiple medical professionals review a file, each medical professional and all other Benefit Center professionals share responsibility for coordinating their opinions and ensuring that each understands how the various opinions fit together in a coherent view of the claimant's medical condition, capacity, and restrictions/limitations.

### 2. Changes in procedures


Several techniques will be used to ensure that claimants with multiple conditions are fully and fairly evaluated regarding the totality of their limitations. These alternatives include

- Designated clinical consultant in each impairment unit to receive and manage consultation requests from other units
- Access to multi-disciplinary meetings to consider totality of impairments
- Referral to generalist or primary care physician (internist, occupational physician, or family practitioner) to consider effects of all conditions on overall function and limitations

     Each of these techniques is currently in use at two or more locations, and all locations
     use at least two of these techniques.

A Medical Analysis Checklist (see format below) has been developed as a tool for Benefit Center professionals. The checklist should be used when multiple on-site physicians have reviewed a file, and is available as a tool for organizing a whole person analysis of impairments for any claimant.

**3. Training**

Clinical, Vocational, and Medical Directors at each claim processing location will identify areas for company-sponsored continuing nursing and physician education.

**Medical Analysis Checklist**

The checklist may be useful at several points during a claim, including liability determination, change of definition, and contemplated claim closure. It provides a "snapshot" at a particular point in time of all recent treaters, diagnoses/syndromes/problem areas identified, restrictions and limitations arising from each, and our contractual assessment of those restrictions and limitations.
For illustrative purposes only, an example is offered below on how the form might be used.

**Claimant:** _Jeff Styles_____   **Soc Sec #:** _345_-_67_-_8912_   **Date:** _8_/_11_/_2004_

| Physicians Consulted In Last Year | | Diagnoses or Syndromes | Restriction Identified | Limitation Identified | Assessment |
|---|---|---|---|---|---|
| Physician | Date Last Seen | | | | |
| | | | | | |
| Thos. Moore, MD | 7/9/04 | 1. Cardiomyopathy | | Sedentary work only | Mr. Styles' insured occ as foreman required frequent walking; at change of def we have identified gainful sedentary positions in his region |
| | | | Must be able to elevate feet above chest 10" every | | Voc reports this is an accommodation permitted by most employers, and confirmed by those |

| | | | hour | | offering gainful positions |
|---|---|---|---|---|---|
| | | | No lifting over 10# | | Available in gainful positions |
| | | 2. Atrial fibrillation | No work near microwaves or large electrical power sources due to implanted defibrillator | No lifting over 20# | Available in gainful positions |
| Roger Grise, PhD | 6/7/04 | 3. Depression | | Impairments in interpersonal relations; concentration; deep pessimism | Dr. Grise reports depressive symptoms have remitted; GAF now 72; limitations considered resolved per OSP assessment of 7/29/04; Dr. G agrees per letter of 8/4/04 |
| James Fisher, MD | 4/12/04 | 4. Fatigue | No prolonged standing or walking (>30"); requires variable schedule and up to 1 hr of rest per 4 hrs worked | | Re-conditoning via PT improved endurance as of 7/29/04 per Dr. Liu |
| Frederick Liu, MD | 5/7/04 | 5. Diabetes mellitus | Regular meals; no overtime; needs regular schedule | | Gainful occupations permit regular hours |
| | | 6. Epilepsy | | | Never asserted as cause of disability; has been well controlled since 1993 by medication |

| | | 7. Chronic pain (fibromyalgia) | | Cannot work more than 2 hrs daily | Through cog-behav program delivered through Dr. Grise, Mr. Styles has improved his conditioning and attitude and now reports he is ready for a gradual RTW. Dr. Liu concurs and will manage rehab program |
| --- | --- | --- | --- | --- | --- |

## EXHIBIT 5

## UNUMPROVIDENT CLINICAL, VOCATIONAL, AND MEDICAL SERVICES STATEMENT REGARDING PROFESSIONAL CONDUCT

Dear Benefits Center Clinical, Vocational, or Medical Professional:

UnumProvident is committed to standards for the prompt, fair and reasonable evaluation and settlement of claims. As participants in the claims process we play an integral role in achieving these service standards and must be willing to subscribe to the Benefits Center Philosophy:

*With a commitment to integrity, quality and superior service, we will:*

- Make appropriate decisions by providing a thorough, fair and objective evaluation of all claims.
- Pay all valid claims in a timely manner with a high level of service.
- Partner with our customers in their efforts to return to work or to independent living.

The Benefits Center Philosophy cannot be fully realized without our full commitment to our professional ethical standards. Likewise, UnumProvident's commitment is that these standards not be compromised in the course of our work activities on its behalf. Ultimately, however, professional ethical conduct is an individual responsibility. The measure of our success is how we conduct ourselves each day.

Please review and retain the attached "UnumProvident Clinical, Vocational, and Medical Resource Statement Regarding Professional Conduct." I/we am/are confident in your commitment to conduct yourselves in accordance with these high standards.

Sincerely,


Chief Ethics Officer



**UnumProvident Clinical, Vocational, and Medical Professionals'
Statement Regarding Professional Conduct**

**Clinical, vocational, and medical professionals within the Benefits Center will:**

- **Comply with all applicable laws, ethical codes, and standards of professional conduct.**
- **Communicate with partners and internal customers promptly and professionally.**

- **Discuss medical and/or vocational facts in an open and honest manner.**
- **Provide fair and reasonable evaluations considering all available medical and/or vocational evidence, both objective and subjective, both supporting impairment and supporting capacity.**
- **Consider all diagnoses and impairments, and their effect on the whole person, when evaluating medical and/or vocational data in a claim file.**
- **Work with or refer files to other appropriate medical personnel when specialization prevents one professional from considering all impairments and diagnoses in an evaluation of the whole person.**
- **Complete "Fair Claims Settlement Practice" training annually.**
- **Represent medical and/or vocational facts accurately.**
- **Provide reasonable, clear, and accurate explanations of professional opinions so that clear and full explanations of decisions based on those opinions are available to the claimant.**
- **Avoid redundant or unnecessary requests for information, e.g. duplicate information, data not reasonably required for adequate analysis, or data not material to the analysis of the claim.**
- **Report any significant barriers to achieving the Benefits Center Philosophy and its application to your management, directly to the company's Chief Ethics Officer or through the Business Practices & Ethics Hotline as outlined in UnumProvident's Code of Business Practices & Ethics.**

---

**I have read and understand the principles and guidelines above. I agree to abide by these principles in my work on behalf of UnumProvident Corporation, and to consult with peers, managers, and ultimately the Chief Ethics Officer if I am unclear regarding my responsibilities under these principles or encounter barriers to abiding by them. In addition, prior to making each determination as to a claimant's impairment, for which I have been trained, I will certify that I have reviewed all medical, clinical, vocational and other evidence provided to me bearing upon impairment.**

_____          _____
**Name**                                                                                  **Date**

## EXHIBIT 6

## GUIDELINES FOR INDEPENDENT MEDICAL EVALUATIONS

A. Attending Physician ("AP") Related. If a determination is made that the medical information in the claim file lacks clarity or sufficiency in assessing the insured's medical condition in order to validate the claim under the requirements of the applicable policy or if the Company has reason to question the opinions or information provided by a claimant's AP, the appropriate Company medical professional should contact the AP either by phone or by letter for clarification or additional information. If a telephone contact cannot be arranged, a letter outlining the question(s) and issues should be sent to the AP, which invites a reply either by phone or by letter.

Following such contact, if the Company's medical professional and the AP are unable to reach an agreement on the medical issue or issues and its or their effect on the claimant's capacity for work an independent medical evaluation should be sought under the following guidelines unless the decision is made to pay or continue to pay the claim:

1. An independent record review should be sought whenever the lack of agreement primarily concerns an issue of data interpretation, and therefore an examination of the claimant would not be useful to understand the allegedly impairing condition.

2. An independent medical examination ("IME") of the claimant should be sought whenever there is lack of agreement and the opinion of the Company's medical professionals involved in the claim file is the primary basis for the denial or termination of benefits unless the following conditions are satisfied in which instance an IME need not be sought, and the claim file is documented with regard to these conditions being satisfied:

    i. The Chief Medical Officer ("CMO") of the Company or one of the Company's certified medical specialists with the highest level credentials in the specialty field in the Company relating to the claim and designated by the CMO to perform such reviews ("DMO") has reviewed the specific claim, focusing particularly on the area or areas of disagreement between the AP and the Company's medical professionals involved in the claim file,

    ii. The CMO or the DMO reviewing the specific claim file performs his or her separate analysis of the issue or issues upon which there is disagreement, including any other information in the file deemed by the reviewing CMO or DMO to be relevant to the claim decision, and

    iii. The CMO or the DMO reviewing the specific claim file concludes that there is reasonable medical certainty supporting the position of the Company's medical professionals involved in the claim file and in disagreement with the AP, after having determined that the AP's opinion is not well supported by medically acceptable clinical or laboratory diagnostic techniques and is inconsistent with the other substantial evidence in the claim file.

If the CMO or the DMO reviewing the specific claim file is unable to reach the conclusion set forth in subparagraph 2.iii. above, then an IME should be performed.

If the CMO or DMO agree with the AP's opinion, there is agreement as to the current existence of a disabling condition and no IME is needed at the present time.

B. An IME (or in circumstances relating to an issue of data interpretation in which case an independent record review) should be sought whenever any of the following occurs unless the decision is made to pay or continue to pay the claim:

1. A prior IME found disabling limitations and the current impairment is based on the same limitations;
2. A Company medical professional or other Company resource, e.g., legal/compliance, Benefit Specialist responsible for the claim, states that an IME is needed;
3. There is a difference of opinion between two or more of the Company's medical professionals with respect to the existence of a disabling condition; or
4. The claimant or the AP requests an IME, either directly or through the claimant's representative.

C. An IME must be obtained and conducted on the basis of objective, professional criteria:

1. The Company shall select individuals to conduct IME's solely on the basis of objective, professional criteria, and without regard to results of previous IME's conducted by such individuals; and,

2. Neither the Company nor any of its officers or employees shall attempt to influence the impairment determinations of professionals conducting IME's.

## EXHIBIT 7

## PROOF OF LOSS—DISABILITY CLAIMS

**Introduction:** The Companies' disability contracts require claimants to file a completed claim form when they are making a claim for benefits. This completed claim form satisfies the claimant's initial obligation to provide proof of loss as discussed below. Thereafter, the Company and the claimant work together to expedite the identification, retrieval and review of all information necessary to validate the payment of benefits under the applicable policy. The following details the proof of loss process:

**Initial Proof of Loss:** As part of the claim submission process, the claimant must provide information concerning the impairing condition. This information includes:

Claim forms, medical records, letters from physicians and other sources
Employment records, tax records and other professional records

**Ongoing Proof of Loss:** Once initial information is provided, the claimant has a legal obligation to cooperate with the Company's efforts to obtain any material information needed to assess the claim on an ongoing basis.

**Company's Obligation to Verify and Validate:** When a claimant submits a claim, the Company must first verify that the claimant is eligible for coverage under the applicable policy(ies). The Company also must validate the nature of the impairment and how it limits or restricts the claimant from engaging in his or her occupation. The Company's obligation may be fulfilled by seeking additional information, which can include:

Additional medical records and/or tests
Financial records for purposes of determining income loss and benefit levels
Records related to employment as well as occupational duties
Other lawful methods of information-gathering that assist in validating the claim

The Company is entitled to request a written authorization from the claimant in order to obtain additional medical or other information. The Company has an obligation to use such authorization to seek needed information at its own expense. The claimant is obliged to cooperate by providing information or documents in his or her possession and by otherwise participating in the claim investigation (e.g. attendance at an Independent Medical Examination.)

**Communications with the Claimant:** Throughout the claim administration process, the Company must alert the claimant as to any information or documents which are needed to pay benefits under the applicable policy.

**Independent Medical Examinations and testing:** In some instances, it may be appropriate for the Company to invoke its contractual right to request that the claimant

submit to an Independent Medical Examination, which may include additional medical tests. Specific guidelines for such Examinations are set forth in Exhibit 6.

**Claim Handling Decisions:** After the Company has made a good faith effort to obtain all material information necessary to make an informed claim decision, the information is analyzed and weighed in a fair and balanced manner. If the Company has sufficient evidence to validate the payment of benefits under the applicable policy's requirements, the claim will be paid.